1

```
 1    BEFORE THE DISCIPLINARY PANEL OF THE CITY COUNCIL

 2           OF THE CITY OF CHATTANOOGA, TENNESSEE

 3    ------------------------------------------------

 4    IN RE:  PERSONNEL HEARING OF
              SGT. LEIGH TAYLOR NOORBERGEN
 5            MAY 1, 2006

 6    ------------------------------------------------

 7           CITY COMMISSIONERS:

 8           JOHN FRANKLIN, JR., CHAIRMAN
             LINDA BENNETT
 9           WALLACE POWERS

10           ADVISOR TO COMMISSIONERS:

11           LARRY L. CASH, ESQUIRE
             832 GEORGIA AVENUE, SUITE 1000
12           CHATTANOOGA, TENNESSEE  37402

13           APPEARING FOR CHATTANOOGA
             POLICE DEPARTMENT:
14
             WILLIAM SHELLEY PARKER, JR., ESQUIRE
15           POLICE SERVICES CENTER
             3300 AMNICOLA HIGHWAY
16           CHATTANOOGA, TENNESSEE  37406

17           APPEARING FOR SGT. NOORBERGEN:

18           D. SCOTT BENNETT, ESQUIRE
             LEITNER, WILLIAMS, DOOLEY
19           AND NAPOLITAN
             801 BROAD STREET, THIRD FLOOR
20           CHATTANOOGA, TENNESSEE  37402

21

22                   HALL & ASSOCIATES
                1010 MARKET STREET, SUITE 402
23             CHATTANOOGA, TENNESSEE  37402
                      423-267-4328
24               CONNIE CARPENTER, REPORTER

25
```

58

1    a break for lunch. Then we'll reconvene at 1:00.
2    I would like to ask everyone that we not discuss
3    any parts of the proceeding outside of this room.
4    We'll adjourn at 1:00. Thank you.
5              (Recess taken.)
6              (Hearing in session.)
7              MR. FRANKLIN: We will reconvene our
8    hearing at this point. You may call your next
9    witness.
10             VALERIE MYERS,
11   called as a witness, having first been duly sworn,
12   testified as follows:
13             DIRECT EXAMINATION
14   BY MR. PARKER:
15   Q        State your name, please.
16   A        Valerie Elizabeth Myers.
17   Q        Speak up a little bit. Where do you
18   live, what part of town?
19   A        South Brainerd.
20   Q        Have you lived in Chattanooga all your
21   life?
22   A        Yes, I have.
23   Q        Who is your mother?
24   A        Charlene Garrett.
25   Q        Where does she live?

59

1    A        Eighth Street.
2    Q        Near the intersection of McCallie and
3    Central Avenues?
4    A        Yes.
5    Q        I believe you have an 18-year-old
6    daughter?
7    A        Yes.
8    Q        Jasmine Hall?
9    A        Yes, sir.
10   Q        Last October 12 did you and your
11   daughter have occasion to go visit your mother?
12   A        Yes.
13   Q        Before we get to that, has your mother
14   had health problems in the past?
15   A        Yes.
16   Q        She had a heart attack several years
17   ago?
18   A        Yes.
19   Q        What was the purpose of your visit to
20   your mother that day?
21   A        We were just going by to check on her.
22   The past week she hadn't been feeling well. That
23   was my only off day. May daughter's volley ball
24   team had just completed their season, and that was
25   the only off day she had and I had together so

60

1    that we could spend time together.
2    Q        Was she 18 at that time?
3    A        She was 17.
4    Q        She's a senior at Howard High School?
5    A        Yes.
6    Q        By the way, where do you work?
7    A        United States Postal Service.
8    Q        Where is that?
9    A        911 Eastgate Loop.
10   Q        How long have you worked for them?
11   A        January of '96.
12   Q        A little over ten years?
13   A        Yes, sir.
14   Q        What do there, just out of curiosity?
15   A        I'm an in-coder. What we do is key in
16   the codes on the mail that are unreadable. It
17   makes it not wrong so that somebody will get their
18   mail.
19   Q        Prior to last October 12th, had you
20   ever be arrested before?
21   A        No.
22   Q        I believe you had a ticket one time?
23   A        For registration.
24   Q        You got that all straightened out?
25   A        Yes.

61

1    Q        But you've never been arrested prior
2    to October 12?
3    A        No.
4    Q        When you and your daughter got over to
5    your mother's house, your daughter was hungry, was
6    she not?
7    A        Yes.
8    Q        If you would, just kind of pick up the
9    story and tell the Council members what happened
10   from the point that she left the house to go get
11   something to eat.
12   A        I pulled into my mom's driveway and I
13   went inside. My daughter figured that it would be
14   a little longer. We were going to get something
15   to eat, but once we get over to my mom's house we
16   tend to talk a lot. It would probably have been
17   probably two or three hours before I left. She
18   said, let me go get something to eat right quick.
19   I said fine.
20             She got in on the driver's side, and I
21   went into my mom's house and put my purse down and
22   started going through mail. I still have mail
23   that comes to that residence. My daughter called
24   my cell phone and said, Mom, the car is stopped
25   again, come out here and fix it. I stepped

62

1  outside, just walked back outside and went up to
2  the car and noticed --
3  Q        Let me interrupt.  Where was the car
4  at the point?
5  A        It was directly -- she had just pulled
6  out of the driveway and was headed forward.  So it
7  was a couple of feet outside of my mom's driveway.
8  Q        It was in the alleyway?
9  A        Yes.
10  Q        The alleyway runs parallel to McCallie
11  Avenue?
12  A        Yes.
13  Q        Between the alley and McCallie Avenue,
14  along Central at the Kanku's Market; is that
15  correct?
16  A        Yes.
17  Q        Go ahead.
18  A        I noticed a patrol car blocking the
19  way that she could get out.  It's always patrol
20  cars right there that block the alleyway.  I took
21  pictures of it not just at this one incident, but
22  I have pictures from at night anytime I come
23  through and there are beer trucks, delivery
24  trucks, anything.  I said let me take a picture of
25  that car right quick before I start trying to see

63

1  what's wrong.  So I went and got the digital
2  camera out of the car and started taking pictures
3  with my digital camera.
4          I walked up in back of the car.
5  That's when the sergeant and the meter lady came
6  out of Kanku's and saw that I was taking pictures
7  of the car.  There was a little words said.  I
8  could see they were looking in my direction.  Her
9  facial expression didn't look pretty.  I --
10  Q        When you say her, you're talking about
11  Sgt. Noorbergen?
12  A        Yes.  So I didn't want any
13  confrontation.  I started walking back down the
14  alleyway.  I went to the car and put my digital
15  camera back in the car and got in to turn it over.
16  It wouldn't turn over.  I got out and opened the
17  latch on the hood and popped the hood and got
18  under it and started messing with the battery
19  cables.  There was acid around the battery.
20          I put the hood down, and when I turned
21  around -- when I got back in the car the Sergeant
22  pulled down in the alley directly in front of my
23  car.  She got out and asked me my name.
24          She said, what's your name?
25          I said, Valerie Myers.

64

1          She said, may I have your I.D.?
2          I said, what's going on?
3          She said, you're blocking the alleyway
4  and that's illegal.
5          I didn't say anything, but you know,
6  my expression was like, that's what you were doing
7  yourself.  I didn't say anything.
8          I said, I don't have my I.D. on me.
9          She said, so you were driving your car
10  without a license?
11          I said, ma'am, you did not see me
12  driving this car.
13          She said, that's not what I'll say in
14  court.
15          I didn't say anything out loud.  I
16  just kind of said the situation is just not right,
17  you know, her expression and stuff.  I went around
18  to the driver's side to get the digital camera
19  out.  She stopped me at the door and pushed it
20  closed.
21          She said, did I tell you to move?
22          I said, okay, you didn't tell me not
23  to move.  What's going on?
24          She said, you need to lower your tone.
25          I said, ma'am, I am not speaking any

65

1  louder than you are speaking to me.  I said,
2  what's the problem?  I said, am I under arrest?
3          She didn't say anything and just stood
4  there and looked at me.  It seemed like quite a
5  bit of time, like minutes passed, but it was in
6  actuality only seconds.  She just stood there and
7  never said anything.
8          Then she said, turn around.
9          I turned around and faced the car.
10          She said, put your hands behind your
11  back.
12          I just put my hands back and started
13  shaking my head and laughing at what was
14  happening.  My daughter got out of the car.  She
15  was saying -- I don't know her exact words but
16  something like, Mama, what's going on, what's
17  going on.
18          I said, Jasmine, go get your
19  grandmother and tell her I'm going to jail.
20          She placed handcuffs on me.  I'm
21  facing -- this is the passenger -- drivers's side
22  of the car.  I'm facing this way and had the
23  handcuffs on.  She proceeded to pull me by the
24  handcuffs backwards.
25          I was saying, ma'am, I'm losing my

**66**

1  balance.  I said, if you just turn me around and
2  tell me which way to walk, I'll walk.  I said, you
3  don't have to drag me.
4          She didn't say anything and started
5  pulling the handcuffs and stretching my arms.  She
6  took me in between the cars.  Once we were in the
7  between the cars she stopped, hesitated, and got a
8  better grip and started pulling my head and the
9  handcuffs that way.
10          I was saying, ma'am, just tell me
11  which way to walk.  I said, you don't have to drag
12  me.
13          Finally, I was just maintaining my
14  balance.  I just did not want to fall down in the
15  dirt.  I mean, I was handcuffed.  She got me
16  around to her driver's side back door.  Then she
17  walked me around to the back of her car and told
18  me to spread my legs.  She patted me down.  Then
19  she walked me, which was easier because I'm facing
20  the direction of which way I'm walking.  She
21  walked me and placed me in the car.  That's when
22  another officer drove up and asked did she need
23  help and things like that.
24  Q        Let me back up just a minute.  What
25  was your intent behind taking the pictures?  Who

**67**

1  were you going to give the pictures to?
2  A        The M.L. King Neighborhood
3  Association.  They send out newsletters monthly.
4  It's a Weed And Seed Program in place in the
5  neighborhood.  In the newsletter is pictures of
6  police officers in the neighborhood.  You see them
7  with the kids.  They have cleanup days.  I know
8  they have good communications with the police
9  officers and the neighborhood organizations.  I
10  was thinking if I send them the pictures and ask
11  them to be a little more considerate of elderly
12  people that live in the neighborhood that use the
13  alley, and they'll kind of move their cars to the
14  side.  That was my only intention, just to take
15  pictures period.
16  Q        Do you have a concern about your
17  mother's health and possibly getting help to her?
18  A        Yes.  The ambulance or something.  One
19  officer one night when I was taking pictures, he
20  asked me, what are you doing, do you have a thing
21  for police officers?
22          I said, no.  I said, ya'll could be a
23  little more considerate when you park your cars
24  because my mom actually uses the alley daily.
25  They say that since it's a dual access alley, she

**68**

1  could go around.
2          I said, what, the ambulance or
3  somebody?
4          And he said, they can go around.
5          I said, according to the old saying,
6  seconds count when you're saving lives.
7          He said, well, it's not my car.  I
8  know whose it is.
9          He went inside Kanku's and told the
10  other officer whose car it was to move the car and
11  he did.  He was friendly.  He wasn't
12  confrontational.
13  Q        He did move it?
14  A        Yes, sir.
15  Q        I'll show you what has previously been
16  marked as Collective Exhibit 3.  Are these three
17  of the photographs that you took that particular
18  day, October 12th?
19  A        Yes.
20  Q        What has been marked as Exhibit 3A
21  there, to the left side of that -- let me hold it
22  up so the council members can see it.  To the left
23  of the photograph is the vehicle operated by the
24  PST?
25  A        Yes.

**69**

1  Q        In the middle is the vehicle operated
2  by Sgt. Noorbergen?
3  A        Yes.
4  Q        It appears to me there is enough room
5  for Sgt. Noorbergen to have parked in front of the
6  PST's vehicle.  Do you recall if there was enough
7  room for her to park over there that day?
8  A        I don't know.
9  Q        In the photograph does it look like
10  there is?
11  A        It's a dump street right there, and I
12  wouldn't advise it.  I really wouldn't.
13  Q        Do you recall if the other parking
14  spaces there at the market were all full?
15  A        No, I don't.  But one of the pictures
16  that I took, it shows that only three spots were
17  taken.  All the other spots were empty.
18  Q        I'll mark this as Exhibit 3D.  Is that
19  one of the photographs you took that day?
20  A        Yes.
21  Q        That was after they had come out?
22  A        Yes.
23  Q        And that shows several open parking
24  spaces in front of Kanku's Market?
25  A        Yes.

70

1   Q        Did you raise your voice --

2   A        No.

3   Q        -- to Sgt. Noorbergen?

4   A        No.

5   Q        Did you scream at Sgt. Noorbergen?

6   A        No.

7   Q        Did you scream at any point during

8   this whole thing?

9   A        No.

10  Q        Did you yell during this?

11  A        No.

12  Q        Did you resist being placed under

13  arrest?

14  A        No.

15  Q        Did you resist her escorting you to

16  her car after you had been handcuffed?

17  A        No.

18  Q        After she put you in the back of

19  patrol car, I think your daughter ran down and got

20  your mother?

21  A        Yes.

22  Q        Did you hear any of that conversation

23  between Sgt. Noorbergen and your mother?

24  A        Yes.

25  Q        Did you hear any of the conversation?

71

1   A        I heard my mom ask her, she said,

2   ma'am, I'm her mother.  Can you tell me what's

3   going on?

4            She said, I'm arresting your daughter

5   for disorderly conduct.

6            She was the one who was irate and mad,

7   Sgt. Noorbergen.

8   Q        What happened next?  After you were in

9   the back of the police car, what happened next?

10  A        She took me down to the station.

11  Q        Down to the county jail?

12  A        Yes.

13  Q        Go ahead and describe your experience

14  there.  Walk the council members through it.

15  A        For one thing, it was humiliating to

16  me.  I had never been down there.  I didn't know

17  what to expect from it.  I had to take off my

18  shoes and belt.  I mean, it was just something I

19  had never experienced and I never want to again.

20  It was women that they placed me with in the

21  little room, the holding cell or something.  They

22  was telling me that if we didn't get out by a

23  certain time, they would send me to Silverdale.  I

24  got afraid.  I've never been arrested.  I'm sorry.

25  I was afraid.

72

1            There were men in uniforms.  I saw one

2   shackled.  When they said we was going to

3   Silverdale, I asked this officer that was down

4   there how long before I can call someone to get

5   out of here.  He said, you'll find out when it's

6   your turn.  They'll call you.

7            To me, he treated me like a common

8   criminal.  I mean, I just didn't -- excuse me.  I'm

9   sorry.  Less than human, that's the way I felt.

10  Q        What time did you finally get out?

11  A        It was 11:30 or 12:00.

12  Q        Did you mother and daughter pick you

13  up?

14  A        Yes, sir.

15  Q        Did they wait outside all evening?

16  A        Yes, sir.

17  Q        Did you have to post bond?

18  A        No.

19  Q        You were released on your own

20  recognizance?

21  A        Yes, sir.

22  Q        The charges that were brought against

23  you for disorderly conduct and resisting arrest,

24  what ultimately happened to those charges?

25  A        We went to court, and she didn't show

73

1   up the first time.  So they rescheduled it.  The

2   second time she didn't come again.  My attorney

3   said she would speak with the prosecutor and the

4   other attorney and they said they would dismiss

5   the charges, but I would have to pay court cost

6   and that she could get it expunged from my record.

7   I'm a federal employee.  They were going to

8   discipline me at work, possibly fire me because of

9   this.

10  Q        Did you have to hire an attorney to

11  represent you with respect to those criminal

12  charges?

13  A        Yes.

14  Q        Did you hire a different attorney to

15  handle the matters at work?

16  A        Yes.

17  Q        Together how much did the two

18  attorneys cost you?

19  A        The exact amount, I'm not sure.

20  Q        Just a rough figure.

21  A        About $750.

22  Q        Seven hundred fifty dollars?

23  A        Uh-huh.  It was 500 just to see one

24  attorney starting out.  My job started harassing

25  me, and I had to pay another attorney to contact

**74**

1   my employer.

2   Q          Ultimately the record of these charges

3   was expunged is your understanding?

4   A          Yes.

5   Q          At the time you opened the hood, was

6   your daughter in the car?

7   A          Yes.

8   Q          She stayed in the car?

9   A          Yes.

10  Q          Did she have the door open?

11  A          Yes.

12  Q          She was on the passenger side?

13  A          Yes.

14  Q          The initial exchange between you and

15  Sgt. Noorbergen, was it right there in front of

16  the car or over around on the left side?

17  A          In front of the car.

18  Q          What kind of vehicle was it that you

19  were in?

20  A          It's an Isuzu Trooper.

21  Q          Isuzu Trooper?

22  A          Yes.

23  Q          From the time that she approached you

24  until the time you were placed in handcuffs, how

25  long a period of time -- and I know you weren't

**75**

1   looking at your watch probably.  Do you know about

2   how long it took for all that to transpire?

3   A          I'm not sure, but approximately no

4   more than ten minutes.

5   Q          Would you be surprised if I told you

6   the radio traffic said it was exactly two minutes?

7   A          Yes.  Very surprised.

8          MR. PARKER:  I believe that's all.

9                  CROSS-EXAMINATION

10  BY MR. BENNETT:

11  Q          Ms. Myers, good afternoon.  My name is

12  Scott Bennett.  I'm the attorney representing Sgt.

13  Noorbergen in this matter.  I've got a few

14  questions for you.  When you were looking under

15  your hood, you didn't hear Sgt. Noorbergen

16  approach and ask if there was a problem, did you?

17  A          No, sir.

18  Q          Earlier when you were taking pictures

19  of the vehicle, of police vehicles, you did hear

20  Sgt. Noorbergen say what her car number was;

21  correct?

22  A          Something to that effect, kind of

23  snipey.

24  Q          You heard her say something?

25  A          Yes.

**76**

1   Q          You didn't respond to her?

2   A          No, sir.

3   Q          When Sgt. Noorbergen asked you if you

4   were driving without a license, your response was,

5   you didn't see me drive?

6   A          Yes, sir.

7   Q          Later when Sgt. Noorbergen asked you

8   to lower your tone, your response to her was that

9   you were speaking the same tone of voice as Sgt.

10  Noorbergen; correct?

11  A          Yes.

12  Q          That's true, isn't it?  You two were

13  using the same tone of voice?

14  A          I said, ma'am, I'm talking to you no

15  louder than you're talking to me.  At that time

16  the conversation level was as we are speaking now.

17  Q          When Sgt. Noorbergen placed you under

18  arrest she cuffed you; correct?

19  A          Yes.

20  Q          Do I understand correctly that she

21  cuffed you with your hands behind your back and

22  pulled you backwards?

23  A          By the handcuffs.

24  Q          At some point she grabbed your head?

25  A          Yes.

**77**

1   Q          And pulled you back by your head and

2   your handcuffs; is that right?

3   A          Yes.

4   Q          Let me show you what we have already

5   marked as an exhibit.  This is Exhibit 12.  Do you

6   recognize that?

7   A          Yes, sir.

8   Q          Is this a statement that you put

9   together for internal affairs?

10  A          Yes, sir.

11  Q          And the first full paragraph on the

12  second page where you're describing the

13  handcuffing, take a minute to look at that and

14  refresh your recollection.

15  A          (Witness complies.)

16  Q          Have you read it?

17  A          Yes, sir.

18  Q          Does this statement represent an

19  accurate description of events that transpired

20  between you and Sgt. Noorbergen?

21  A          It's accurate as I can recall.  It was

22  very disturbing.

23  Q          Look at the second sentence in

24  particular.  The officer began forcibly pulling me

25  by the handcuffs, almost making me lose my

78

1  balance.
2  A        Yes.
3  Q        Today you recall that happening;
4  correct?
5  A        Yes, sir.
6  Q        She grabbed you by the handcuffs and
7  was pulling you backwards?
8  A        Yes, sir.  She didn't say walk to the
9  car or anything.  I was just turned and she was
10  behind me.  I didn't know what she was doing
11  behind me.  She just began pulling me.
12  Q        She pulled your backwards?
13  A        Yes, sir.
14  Q        And grabbed hour head too?
15  A        Not at that time.
16  Q        A little later she grabbed your head?
17  A        Yes, sir.
18  Q        Do I recall, also, from the statement
19  that you gave Sgt. Mincy that you felt you were
20  being dragged to the ground?
21  A        Once we got in between the cars, yes,
22  that was my opinion and the way I felt.  She
23  hesitated when we went in between the cars.  She
24  stopped, and that's when she grabbed my head and
25  began pulling me.  It was even more so like she

79

1  was trying to pull me down to the ground instead
2  of trying to walk me toward the car.
3  Q        So your perception from where you were
4  then was that you were handcuffed and you felt
5  that Sgt. Noorbergen was pulling you back hard
6  enough that maybe she was dragging you to the
7  ground; is that correct?
8  A        When she stopped in between the cars,
9  that's when she stopped and hesitated.  I was
10  hoping she would turn me around and let me walk
11  toward the car, but she just -- like I say, she
12  was behind me.  I don't know what she was doing.
13  It was like she just got a grip or got her balance
14  and started just pulling.  I'm like, ma'am, please
15  just tell me which way to walk.
16  Q        You felt you were being pulled upon
17  pretty forcibly, didn't you?
18  A        Yes, like she was trying to hurt me.
19  Q        Would you say she was pulling on you
20  pretty vigorously?
21  A        Forcibly.  Honestly, it felt like her
22  intent was to do harm to me.  I wouldn't say
23  vigorously.
24  Q        Whatever that word means, you felt she
25  was pulling on you hard enough that you thought

80

1  you were going to get hurt?
2  A        Yes, that she was going to hurt me.
3  Q        I assume as you're being pulled
4  backwards you were trying to maintain your balance
5  and you were trying to lean forward to stay
6  upright; correct?
7  A        I wasn't leaning forward.  I was just
8  trying to step according to the direction she was
9  pulling.
10  Q        So you were trying to step back the
11  way you thought she wanted you to go so you could
12  stay upright?
13  A        The way she was pulling me.
14  Q        In the direction she was pulling you
15  were leaning accordingly to try and stay upright?
16  A        To stay with her, yes.
17  Q        As you were being placed under arrest,
18  did you notice some individuals in the alleyway
19  above your car?
20  A        At what time would this be?
21  Q        I don't know what time it would be.
22  During the time you were having the discussion
23  with Sgt. Noorbergen.
24  A        The discussion before she handcuffed
25  me or after?

81

1  Q        Before or after.
2  A        During the discussion no one was in
3  the alley.  My daughter was in the car and that
4  was it.  After she placed me behind the car and
5  told me to spread my legs, we were further up the
6  alley which means people at the pumps could see
7  us.  My daughter had ran to get my mother and they
8  came back out.
9  Q        Do you recall any individuals?  I
10  think you maybe described to Sgt. Mincy that there
11  were crack-heads in the alleyway?
12  A        No.  What I said in the statement was
13  that there are normally crack-heads in this alley,
14  selling and buying crack.  I have seen a city
15  employee engaged in a sexual act.  I never said
16  crack addicts were in the alley at that time.
17  Q        So if there were any crack-heads or
18  any other individuals in the alley at that time,
19  you didn't see them?
20  A        No one was there.  I'm positive.  You
21  have to understand, my job is to take care of my
22  daughter.  I do not bring unwanted and unnecessary
23  attention to myself.  I'm quiet and reserved, and
24  I stay to myself and I work, period.  I can't
25  afford to go to jail and do things like that,

82

1  illegal things.  So go ahead, ask your question.
2  Q           Ma'am, your daughter described your
3  condition after you had been taken to the car.
4  She said your hair was messed up.  Do you recall
5  that?
6  A           Yes.
7  Q           Was you hair messed up by Sgt.
8  Noorbergen trying to bring you into custody?
9  A           Yes.  I recall that because once she
10  got me behind the car there were other individuals
11  at Kanku's, pumping gas.  Yes, I recall that
12  because I was embarrassed by it.  That's the
13  neighborhood that my child grew up in.  Her
14  friends and she walk around the neighborhood.
15  They patronize Kanku's all the time.  It's
16  embarrassing for her as well.  Yes, I was aware
17  that my hair was all over my head.  I didn't want
18  her to be embarrassed by the situation.
19          MR. BENNETT:  No further questions.
20          REDIRECT EXAMINATION
21  BY MR. PARKER:
22  Q           Did Sgt. Noorbergen ever ask you
23  during this whole thing if you needed any
24  assistance.
25  A           No, sir.

83

1          RECROSS-EXAMINATION
2  BY MR. BENNETT:
3  Q           Ms. Myers, more to the point, if she
4  asked you if you needed any assistance, you didn't
5  hear that question, did you?
6  A           She never asked me that at all.
7  Q           But, of course, you wouldn't know
8  because you didn't hear the question?
9  A           She never asked me that.
10          MR. BENNETT:  No further questions.
11          (Witness steps down.)
12          MR. FRANKLIN:  Next witness.
13          JASMINE HALL,
14  called as a witness, having first been duly sworn,
15  testified as follows:
16          DIRECT EXAMINATION
17  BY MR. PARKER:
18  Q           State your name, please.
19  A           Jasmine Cole Hall.
20  Q           Who is your mother?
21  A           Valerie Myers.
22  Q           You are a student, are you not, at
23  Howard High School?
24  A           Yes.
25  Q           You're getting ready to graduate?

84

1  A           Yes.
2  Q           Where are you going to school next
3  year?
4  A           I don't know.
5  Q           Were you present last October 12, when
6  your mother was arrested by Sgt. Noorbergen?
7  A           Yes, sir.
8  Q           You and your mother went to visit your
9  grandmother?
10  A           Yes.
11  Q           What was the purpose of the visit?
12  A           I don't know.  We just went over there
13  to spend time because I play so many sports.
14  Q           Your volley ball team had just wrapped
15  up the season?
16  A           Yes.
17  Q           And when you got there did you decide
18  to go get something to eat?
19  A           I was supposed to eat before I got
20  there, but she wanted to get to her mom's house.
21  So I would drive myself there.
22  Q           You didn't go in when you first got
23  there?
24  A           I moved to the other side, driver's
25  side.

85

1  Q           Tell me what happened.  This was about
2  7:00 p.m.?
3  A           I don't remember.
4  Q           It was in the evening?
5  A           It wasn't dark yet.
6  Q           If you would, just take it from that
7  point when you pulled out.  Your grandmother lives
8  in that alleyway in a house right off the
9  alleyway; correct?
10  A           Yes.
11  Q           Just tell them what happened.
12  A           The car, like when I drove up the car
13  stopped or whatever.  I was like, man.  That
14  happened all the time.  I was going to get out but
15  I'm lazy, so I just called her and told her to
16  come help me.
17  Q           Where were you when you called?
18  A           The alley.
19  Q           With respect to Kanku's Market, where
20  were you?
21  A           There's a fence right here and then
22  Kanku's.  We was like -- I was about from the
23  garage -- it wasn't that far.  My mom came
24  outside.  She was like -- I mean, she looked at
25  the car first and did something underneath it and

86

1   kind of started it all the way. She was like,
2   hold on and let me take a picture of that police
3   car there. She went in the back and got her
4   camera. She went up and took pictures from the
5   back.
6           Then I saw the meter maid and the
7   police officer. I'm like, Mom, come on, come on.
8   That was it. I didn't hear the police officer say
9   nothing, but I seen her smile and say something to
10  the meter maid.
11  Q          While your mother was taking pictures?
12  A          She looked like she was mad. My mom
13  was already by the car. My mom pulled up again
14  and started it again. The officer came. She
15  drove up. The police officer, she drove up.
16  Q          She moved her car from --
17  A          She moved her car. She was already
18  parked right there. She drove up toward our car
19  instead of backing out. She sat in the car for a
20  minute while my mom was under the hood. Then she
21  got out. My mom had closed the lid. She was
22  like, let me see your I.D. Mom was like, why.
23  She was like, you're blocking the alleyway. My
24  mom said, but you were blocking the alleyway. She
25  wanted the I.D. and my mom said she didn't have

87

1   it.
2           Then the officer said you're driving
3   without a license. My mom was like, you ain't
4   seen me driving. I don't know. They're just
5   going back and forth. My mom walked to the driver
6   side. By that time I was on the passenger side,
7   halfway sitting down and like looking. My mom
8   opened the door, and the lady slammed the door
9   back and said, I didn't tell you to move. Mom
10  said, you didn't tell me I couldn't move. She
11  said, are you going to arrest me or what.
12          By that time I'm like, Mamma, chill
13  out, whatever. Then that's when the lady went
14  off. She told her to lower her tone. Mom said
15  she wasn't talking louder than she was. She told
16  her to turn around. I ran out of the car and I'm
17  like, Mamma, Mamma. I'm trying to say just leave
18  her alone. She was like, get away from me. She
19  said, your mom is going to jail. She was like
20  move, move. I didn't know what to do. My mom
21  told me to go get my grandmother.
22          I went and got my grandmother, and by
23  the time I got back there, my mom's hair was all
24  messed up and all over. I'm like, Mamma, what's
25  wrong with your hair. My mom laughed. She

88

1   couldn't believe it. I couldn't believe it. I
2   guess she was speechless. My grandmother tried to
3   say what's happening. The police lady told her,
4   get away from my car because she's going to jail
5   for disorderly conduct. She slammed the door and
6   drove off. That's how it was.
7   Q          Did you ever hear your mother scream
8   at any point?
9   A          No. My mom was here. They went back
10  and forth.
11  Q          From the point that Sgt. Noorbergen
12  got out of her car until the time she put your
13  mother in cuffs, do you know about how much time
14  passed?
15  A          Repeat the question.
16  Q          From the time that Sgt. Noorbergen got
17  out of her car and came toward your mother until
18  the time she put handcuffs on your mother, can you
19  estimate how much time passed?
20  A          It wasn't that much time. It happened
21  so quick. I can't tell you. It was just us three
22  out there. I felt alone. I was standing there
23  and watching it. I didn't know what to do.
24  Q          Did you see the other lady in a
25  uniform, the police service technician? Did you

89

1   see her there?
2   A          She was all way back at the police
3   car. She didn't move. She was just watching.
4   She never moved.
5   Q          I think you said when Sgt. Noorbergen
6   first came up -- what was the first thing she said
7   that you heard?
8   A          To my mom.
9   Q          Yes.
10  A          Let me see your I.D.
11  Q          Did you hear Sgt. Noorbergen ask your
12  mother if she needed any assistance?
13  A          No.
14  Q          In what position was the hood when
15  Sgt. Noorbergen came walking up to your car?
16  A          It was up.
17  Q          Did she close it shortly thereafter?
18  A          The second time she asked for her
19  I.D., that's when mom closed it. Mom was like,
20  what's going on.
21  Q          Did you see Sgt. Noorbergen actually
22  put the handcuffs on her or did you go down and
23  get your grandmother before that?
24  A          The handcuffs were already on.
25  Q          Then you went to get your grandmother?

90

1    A         Yes.
2    Q         How long did that take for you to go
3    get your grandmother and get back up?
4    A         I ran down there.
5    Q         So when you went to get your
6    grandmother you went behind your vehicle, correct,
7    down the alley?
8    A         (Witness moves head up and down.)
9    Q         You didn't go in front of your
10   vehicle. You went back behind where your vehicle
11   was stopped in the alley?
12   A         Yes.
13   Q         Did you see anyone else down there in
14   the alley?
15   A         No. My grandmother is the only house
16   out there. There's a house in front of my
17   grandmother's house and grandmother's garage.
18   He's the only one that stays there, and he really
19   doesn't go outside unless he has to. He wasn't
20   out there. We don't have people there. Wasn't
21   nobody out there.
22   Q         Before your mother had the handcuffs
23   put on her, did you see anyone else in the area
24   stop to look and see what was going on at all?
25   A         No. When I came back from my

91

1    grandmother's, when I saw my mother behind the
2    police car, there was people pumping gas and they
3    were looking. That's when I started getting mad
4    because it felt like she was trying to embarrass
5    my mamma by having her out there behind the cars.
6    I was like, just put her in the car and don't
7    embarrass her. People were out there pumping gas
8    and just stopping and looking.
9    Q         Prior to the time that Sgt. Noorbergen
10   put the handcuffs on, did you see your mother
11   physically resist in any way?
12   A         I don't want to say she was mad. She
13   was just shaking her head. She pushed her and
14   turned her around. She was like, I'm putting you
15   under arrest. She was like acting out.
16   Q         Your mother acted like she couldn't
17   believe what was happening?
18   A         Yes. I was like, please. She just
19   kept shaking her head. Both of them made me mad
20   because they wouldn't tell me nothing.
21   Q         A couple of times you had to miss
22   school to be in court?
23   A         Exactly.
24   Q         Are you missing school today?
25   A         Yes. I'm missing a very important

92

1    exam.
2              MR. PARKER: I apologize for that.
3    Thank you. That's all the questions I have.
4              CROSS-EXAMINATION
5    BY MR. BENNETT:
6    Q         Ms. Hall, good afternoon. My name is
7    Scott Bennett. I represent Sgt. Noorbergen. Just
8    a couple of quick questions. During the time that
9    you were hearing this discussion between Sgt.
10   Noorbergen and your mother, you were in the car;
11   right?
12   A         Yeah. I was standing by the car.
13   Q         From there you could hear your mother
14   and Sgt. Noorbergen?
15   A         I could hear most of the stuff.
16   Q         You heard Sgt. Noorbergen tell your
17   mother to lower her voice?
18   A         Uh-huh.
19   Q         At that point in time your mother and
20   Sgt. Noorbergen were speaking in the same tone?
21   A         Yes.
22   Q         Somewhere around there you told your
23   mother to chill out; right?
24   A         I was like, Mom, just let it go and
25   calm down. I just wanted her to get in the car.

93

1              MR. BENNETT: That's all I have.
2              (Witness excused.)
3              PATT KAY,
4    called as a witness, having first been duly sworn,
5    testified as follows:
6              DIRECT EXAMINATION
7    BY MR. PARKER:
8    Q         State your name for the record,
9    please.
10   A         Patt Kay.
11   Q         Where are you employed?
12   A         City of Chattanooga Police Department.
13   Q         How long have you been employed in the
14   police department?
15   A         Twelve years.
16   Q         Your current assignment is police
17   service technician?
18   A         That's correct.
19   Q         How long have you done that?
20   A         Two years.
21   Q         What did you do before that?
22   A         I was a dispatcher in communications.
23   Q         For ten years?
24   A         Yes.
25   Q         You know Sgt. Noorbergen?

94

1   A       Yes, I do.
2   Q       Did ya'll last October work the same
3   area of town?
4   A       Yes, sir.
5   Q       What is your area of responsibility as
6   a PST?
7   A       I'm in the Bravo area from Walnut
8   Street down to Main Street.
9   Q       What are your job duties?
10  A       We patrol the area and give parking
11  citations and work minor accidents and minor
12  reports for officers.
13  Q       As part of your training, if you're on
14  the scene where an arrest is being made, are you
15  trained to interfere with that or assist the
16  officer?
17  A       No.
18  Q       You are basically supposed to stand
19  back and watch?
20  A       Yes.
21  Q       You have a radio?
22  A       Yes.
23  Q       But it's not your job and you're not
24  supposed to assist in making the arrest?
25  A       Not at all.

95

1   Q       At approximately 7:00 p.m. last
2   October 12th you went to Kanku's Market there at
3   McCallie and Central, did you not?
4   A       Yes, sir.
5   Q       Had you and Sgt. Noorbergen planned to
6   meet there or did you just happen to run into each
7   other?
8   A       We just ran into each other.
9   Q       What was the purpose of your visit?
10  A       I went to get a beverage.
11  Q       You went inside.  Let me show you what
12  has previously been marked as Collective Exhibit
13  3.  These are some photographs that were taken by
14  Ms. Myers.  This is your vehicle on the left side
15  of Exhibit 3A?
16  A       That's correct.
17  Q       Was Sgt. Noorbergen already there when
18  you got there?
19  A       Yes.  We arrived about the same time.
20  Q       But she pulled in before you did?
21  A       Yes.
22  Q       Your vehicle would not have blocked
23  her from parking over against this wall?
24  A       I don't recall.  I really didn't look.
25  Q       She pulled in first.  This area would

96

1   have been open where you were parked?
2   A       Right.
3   Q       How long were you in Kanku's Market?
4   A       About five minutes.
5   Q       If you would, kind of pick it up from
6   that point and tell the council members what
7   happened when you came out.
8   A       When we came out of the market we had
9   noticed Ms. Myers taking a picture of the car.  I
10  looked at Sgt. Noorbergen and said, look, this
11  lady is taking a picture of your car.  So at that
12  time Sgt. Noorbergen turned around and told her
13  the car number.
14  Q       Did she say something like it's 213
15  and I don't care, or did she have a comment?
16  A       I don't recall that.  I just remember
17  her giving her car number.
18  Q       What happened next?
19  A       Then we departed.  I started to go to
20  my car and Sgt. Noorbergen got in her car to
21  leave.  Then I noticed that Sgt. Noorbergen was
22  stopping and wasn't leaving.  So I got back out of
23  my car and was watching to see what she was doing.
24  At that time she got out and initiated a traffic
25  stop.

97

1   Q       Do you remember Ms. Myers?
2   A       Yes.
3   Q       What was she doing when Sgt.
4   Noorbergen got out?
5   A       Best I remember, she was just standing
6   by the car and the hood was up.
7   Q       Could you hear what was said between
8   the two of them after Sgt. Noorbergen approached?
9   A       No.  I couldn't hear it.
10  Q       In this photograph, Exhibit 3, where
11  would you say you were when Sgt. Noorbergen -- did
12  she pull her car up from the position that is
13  shown here in 3A?
14  A       No, not that I recall.
15  Q       Where were you standing when --
16  A       I was still standing by my car.  I had
17  started to get in it, but then I saw that she was
18  in the middle of a traffic stop.  I stopped and
19  observed.
20  Q       Did you ever come closer to where Ms.
21  Myers was during that confrontation?
22  A       I may.  The furthest I might have come
23  would have been to the end of Sgt. Noorbergen's
24  car.
25  Q       Was that maybe ten to fifteen feet

98

1   from where they were standing and no closer?

2   A        Right.

3   Q        At some point you heard her ask on the

4   radio to send another car?

5   A        I believe how it went, the dispatcher

6   had checked on her after she had gotten out on the

7   traffic stop and was everything okay. She said

8   for now. Then she had backup coming to her.

9   Q        Were you able to understand anything

10  that Sgt. Noorbergen or Ms. Myers said when they

11  were there in front of Ms. Myers' vehicle?

12  A        No.

13  Q        Did either one of them scream?

14  A        I didn't hear anybody screaming. At

15  some point both voices were elevated, but I did

16  not hear screaming.

17  Q        Did you see any people in the area

18  gathering to look and see what was going on?

19  A        Not from where I was standing.

20  Q        Did you see Ms. Myers try to strike

21  Sgt. Noorbergen?

22  A        No.

23  Q        Did you see Sgt. Noorbergen put

24  handcuffs on Ms. Myers?

25  A        Yes.

99

1   Q        Up until that point had Ms. Myers done

2   anything as far as physical resistance to Sgt.

3   Noorbergen?

4   A        I couldn't really see from where I was

5   standing. Her car door was open, Ms. Myers. Ms.

6   Myers was behind that. Sgt. Noorbergen was beside

7   that, so I couldn't really see a lot of her

8   movement.

9   Q        I know you're not a police officer or

10  a lawyer. Did you observe from where you were

11  anything for which you thought Ms. Myers should be

12  arrested?

13  A        I can't answer that because not being

14  an officer, I don't know what would constitute an

15  arrest.

16  Q        As a layman, did you see anything for

17  which you thought she should be arrested?

18  A        I know that when she handcuffed her

19  and was walking her back --

20  Q        I'm talking about up until the point

21  that she was handcuffed.

22  A        No. Like I said, their voices were

23  elevated. I don't know what the conversation was.

24  Q        Not so elevated you were able to

25  understand what they were saying?

100

1   A        Right.

2   Q        After she was handcuffed, Sgt.

3   Noorbergen led Ms. Myers back to her vehicle?

4   A        That's correct.

5   Q        Describe that, if you would. Did Sgt.

6   Noorbergen have to forcibly do that or nudge or

7   push Ms. Myers?

8   A        I guess you would call it prodding her

9   along, trying to get her to walk. Ms. Myers

10  seemed to be pulling away from her. She would go

11  from side to side -- trying to lead her to the

12  back of her car.

13  Q        Ms. Myers didn't kick her?

14  A        No.

15  Q        Didn't yank away from her?

16  A        The movements were such that she could

17  be moving away as she was trying to walk up the

18  hill.

19  Q        She didn't try and run?

20  A        No.

21  Q        Didn't try to hurt Sgt. Noorbergen?

22  A        No.

23  Q        Once Sgt. Noorbergen got Ms. Myers up

24  there, I believe she frisked her before she put

25  her in the back of the car?

101

1   A        That's correct.

2   Q        At one point Ms. Myers' daughter and

3   mother came up. Did you hear any of the exchange

4   at that point?

5   A        They did come up to me, and Sgt.

6   Miller had come up for backup. They were

7   concerned and wanted to know where they were

8   taking Ms. Myers.

9   Q        They weren't disruptive, were they?

10  A        No, not to me they weren't.

11  Q        Were they disruptive to anyone else

12  there at the scene?

13  A        Not that I observed.

14           MR. PARKER: I believe that's all.

15           CROSS-EXAMINATION

16  BY MR. BENNETT:

17  Q        Ms. Kay, I'm Scott Bennett. I'm the

18  attorney representing Sgt. Noorbergen.

19  A        Afternoon.

20  Q        When you and Sgt. Noorbergen were

21  leaving Kanku's and you went back to your car, you

22  told us that you heard Sgt. Noorbergen give her

23  car number; is that correct?

24  A        That's correct.

25  Q        Do you have any idea why she was doing

102

1  that?

2  A        Well, that's an identifier.  Sometimes

3  if an officer gets a complaint on them, that's

4  pretty much how you can track who the officer is.

5  Q        So Sgt. Noorbergen was actually saying

6  this is my identifier?

7  A        Yes.  She volunteered the information.

8  Q        Was she being rude?

9  A        Not that I recall.  She was being

10  informative.

11  Q        Was the tone of her voice discourteous

12  or uncourteous, unprofessional?

13  A        No.

14  Q        When you heard Sgt. Noorbergen and Ms.

15  Myers have their discussion, for want of another

16  way to put it, what kinds of voices were they

17  using?

18  A        They started out in just a normal

19  tone.  Then whatever they were talking about, both

20  of them had escalation in their voices.

21  Q        Their voices escalated?

22  A        Yes.

23  Q        Were they loud?

24  A        Yes.

25  Q        Were they heated?

103

1  A        Just elevated.

2  Q        Now, how far away were you from these

3  ladies when they were having their discussion?

4  A        Probably about 30 feet.

5  Q        Was Ms. Myers as loud as Sgt.

6  Noorbergen was?

7  A        Yes.

8  Q        Now, you testified that you didn't see

9  any crowd gathering?

10  A        That's correct.

11  Q        From where you were standing and where

12  the SUV was parked, could you see up the alleyway?

13  A        No.

14  Q        Were you focusing primarily on Sgt.

15  Noorbergen anyway?

16  A        That's correct.

17  Q        Tell us, if you would, again what you

18  saw happen after Sgt. Noorbergen put Ms. Myers in

19  handcuffs.  Tell us what happened as Sgt.

20  Noorbergen was attempting to walk Ms. Myers to the

21  patrol car.

22  A        They had both started back up towards

23  the hill.  Sgt. Noorbergen was trying to get her

24  to walk up the hill.  Ms. Myers seemed to be

25  pulling away on each side.  As she would turn one

104

1  way, Ms. Myers would turn the other opposite

2  direction, making it hard for her to get up the

3  hill.

4  Q        She was apparently pulling away.  Was

5  she actually trying to pull away?

6  A        From what I saw, it looked like she

7  was pulling away.

8  Q        Before that did you see Ms. Myers not

9  wanting to move her feet?

10  A        I just remember her pulling away at

11  the middle of her torso.

12  Q        Now, what did you do in response to

13  that?

14  A        I still observed, and I knew that Sgt.

15  Noorbergen had backup on the way.  I was just

16  watching in case she needed me to get on the radio

17  and step it up.

18  Q        So you were watching in anticipation

19  of perhaps having to hurry the backup along?

20  A        Right.

21  Q        Why was that?

22  A        Well, when somebody is struggling like

23  that, you don't know what they're going to do in a

24  split second.  It could go either way.

25  Q        From where you were standing 30 feet

105

1  away, watching this exchange, you thought she

2  might need backup sooner?

3  A        Probably.

4  Q        How far did Sgt. Noorbergen have to go

5  to take Ms. Myers from her vehicle to her patrol

6  car?

7  A        About 20 feet.

8  Q        Do you have any idea how much time it

9  took for her to cover that 20 feet?

10  A        I would say at least 60 seconds, at

11  least.

12  Q        From where you were observing, did it

13  appear to take Sgt. Noorbergen a great deal of

14  effort to cover that 20 feet?

15  A        Yes.

16  Q        Do you recall giving a statement in

17  this case to Sgt. Mincy at the internal affairs

18  office?

19  A        Yes.

20  Q        When did you give that statement?

21  A        I believe January.  I don't know the

22  exact date.

23  Q        Could it have been December?

24  A        Possibly.

25  Q        In any case, was it approximately two

106

1  months after this arrest occurred?

2  A       Yes.

3  Q       Before you gave this statement did you

4  have an opportunity to refresh your recollection

5  or to give some thought to what all had happened?

6  A       Not really.

7  Q       Did you have any idea what questions

8  were going to be asked?

9  A       No, sir.

10  Q       Did Sgt. Mincy ask you the same kinds

11  of questions I'm asking you?

12  A       In a way, yes.

13  Q       In a way?

14  A       Yes.

15  Q       How were they different?

16  A       He would ask me, you know, about the

17  footage also, how far it was.  He asked me about

18  if there was any noise or screaming, things like

19  that.

20  Q       By the way, when you were talking to

21  Sgt. Mincy, did you tell him that you were

22  actually standing quite a bit closer?

23  A       Yes.

24  Q       How close did you tell him that you

25  were standing?

107

1  A       I believe ten or fifteen, because I'm

2  not real good with measuring distance.  I have

3  since went back to the scene and walked it off

4  like that so I would know.

5  Q       Since the time you gave your statement

6  to internal affairs, you have gone back and looked

7  at the scene?

8  A       Yes.

9  Q       Looking back, are you comfortably

10  certain you were 30 feet away?

11  A       Yes.  Uh-huh.

12  Q       When Sgt. Mincy was asking you

13  questions, did he ask you the questions in as much

14  detail as I have been asking you?

15  A       I don't remember.

16  Q       Did you have an opportunity to go back

17  and look at the video statement that you gave Sgt.

18  Mincy?

19  A       No.

20  Q       Did he give you an opportunity to

21  review the summary you put together -- that he put

22  together?  I'm sorry.

23  A       No.  That never came up.

24  Q       Have you ever had an opportunity to

25  review either your video statement or the written

108

1  summary for accuracy and clarity?

2  A       Yes.

3  Q       When did you do that?

4  A       I had a copy that Sgt. Noorbergen had.

5  Q       So after the hearing, the first

6  hearing, you had a chance to review your statement

7  for the first time?

8  A       Right.

9  Q       What did you notice about that?

10  A       I noticed that there was two

11  discrepancies in it that I was concerned about.  I

12  wanted to clear it up and make sure everybody had

13  the facts.

14  Q       What were those two discrepancies?

15  A       Well, one of them had that there was

16  not any noise at all.  I felt like I needed to

17  correct that because there were voices that were

18  elevated on both parts.

19  Q       What was the second discrepancy?

20  A       The other one was the part about the

21  resistance.  It had just a -- I believe it was

22  just a simple sentence that said there was no

23  resistance on the part of Ms. Myers.  I just

24  wanted to clarify that the way that she was moving

25  that day, with her going from side to side, I

109

1  thought that to be a form of resistance.

2  Q       What did you do once you saw those

3  discrepancies?

4  A       I had written a letter to my

5  lieutenant to clarify so he could send it to

6  internal affairs so there wouldn't be any question

7  about it.

8          MR. BENNETT:  Mr. Chairman, may I

9  approach?

10          MR. FRANKLIN:  Sure.

11  Q       For the record, I'm showing you what

12  has been marked as Exhibit 14.

13          (Exhibit 14 was marked and received

14  into evidence.)

15  Q       Ms. Kay, I'm showing you what appears

16  to be a note or memorandum prepared by you, dated

17  February 2nd, 2006, to Lieutenant Tom Kennedy.  Is

18  that the note we're talking about?

19  A       Yes, sir, it is.

20  Q       You write, "It has come to my

21  attention concerning an internal affairs

22  investigation of Sgt. Leigh Taylor Noorbergen that

23  incorrect statements were made on my part.  The

24  discrepancy appears in the summary of the written

25  investigation.  It states that PST Kay observed

110

1    Ms. Myers being walked by Sgt. Noorbergen and did
2    not see any resistance by Ms. Myers.
3             During my interview I did state that
4    it appeared that Ms. Myers seemed to be pulling
5    away from Sgt. Noorbergen and was not following
6    her instructions to move her feet and walk to the
7    patrol car. I feel like this should be cleared up
8    pending the hearing that is coming up. I'm not a
9    police officer and do not make arrests, but from
10   where I was standing and what I observed, Ms.
11   Myers appeared not to be in compliance with the
12   orders she was being given by the officer.
13            Thank you and please see that the
14   proper individuals receive this information.
15   Patricia A. Kay."
16            Is that correct?
17   A        That's correct.
18   Q        I noticed here in this statement,
19   actually you didn't mention unless I missed it
20   that you felt like Ms. Myers was being loud. Was
21   that an oversight on your part?
22   A        No. It just came up before when we
23   were talking about the voices being elevated.
24   Q        But standing here today, do you think
25   Ms. Myers was being loud?

111

1    A        I wouldn't say loud. They were both
2    in a heated discussion about whatever they were
3    talking about.
4    Q        Heated discussion, and her voice was
5    as loud as Sgt. Noorbergen's?
6    A        Right.
7    Q        Did you have a followup response to
8    this note?
9    A        No.
10   Q        Did anyone contact you to discuss it?
11   A        No, sir.
12            MR. BENNETT: No further questions.
13            REDIRECT EXAMINATION
14   BY MR. PARKER:
15   Q        Ms. Kay, did you ever call for any
16   assistance for Sgt. Noorbergen?
17   A        No, sir.
18   Q        Did you ever make a call asking the
19   backup officer who was already on the way to step
20   it up?
21   A        No, sir.
22   Q        So Ms. Myers never did anything that
23   caused you alarm?
24   A        No.
25   Q        So that you would make such a call?

112

1    A        Right.
2    Q        That's just part of your job, is to
3    stand by, and if the officer needs help or needs
4    backup, you would call for --
5    A        Right.
6    Q        Do you do that in any similar
7    situation?
8    A        Oh, yeah.
9    Q        That's your training?
10   A        Yes.
11   Q        Let me show you again Exhibit 14. The
12   first sentence says -- second part of it says that
13   an incorrect statement has been made on my part;
14   correct?
15   A        Uh-huh.
16   Q        You attribute what was in the internal
17   affairs report to a misstatement on your part;
18   correct?
19   A        Right. I just wanted to clarify it.
20   Q        Not to anything Sgt. Mincy or anything
21   anybody else did as far as falsifying anything;
22   correct?
23   A        Right.
24            MR. PARKER: That's all.
25            RECROSS-EXAMINATION

113

1    BY MR. BENNETT:
2    Q        Now, Ms. Kay, you testified that you
3    didn't have to call dispatch to ask for backup to
4    be stepped up; correct?
5    A        Right.
6    Q        In fact, as you were about to call for
7    dispatch, you heard dispatch calling to check on
8    Sgt. Noorbergen; correct?
9    A        That's correct.
10   Q        You didn't have to call because
11   dispatch was on top of the situation?
12   A        Right.
13            MR. BENNETT: No further questions.
14            MR. FRANKLIN: Any questions from the
15   panel?
16            MS. BENNETT: I do have a question.
17   Would you have called if you had not gotten a call
18   that they were on the way? Was this a situation
19   where you felt that you needed to make a call for
20   backup in this situation?
21            THE WITNESS: No. At that point it
22   wasn't. I was just observing in case it escalated
23   to that point. It's just from being a dispatcher.
24            MR. FRANKLIN: I have one question.
25   When you were testifying as it relates to the

114

1   process by which Sgt. Noorbergen had at that time
2   arrested Ms. Myers and they were proceeding back
3   to the patrol car, she had been instructed to walk
4   backwards while Sgt. Noorbergen was bringing her
5   back.  You were saying there appeared to be some
6   adjustments, I guess, that you could tell that
7   there may have been or it could have been
8   construed as being resistance to a certain degree.
9   Could that have been in any way because of the
10  awkwardness of the alleyway and/or the awkwardness
11  of trying to measure your steps to get back when
12  someone is pulling you back?  I'm just trying to
13  get clarification on what that was.
14           THE WITNESS:  It could have been.  I
15  wasn't sure if she had told her to walk backwards
16  or forward.  I wasn't sure.  I just saw that
17  resistance from side to side.
18           MR. FRANKLIN:  Anything further?
19           MR. BENNETT:  If you would, clarify
20  for us, ma'am.  Was Ms. Myers being walked forward
21  towards the car or was she being led backward?
22           MR. FRANKLIN:  Backwards to the car?
23           THE WITNESS:  That I'm not sure.  She
24  was walking forward when I saw her.
25           MR. FRANKLIN:  Who was walking

115

1   forward?
2           THE WITNESS:  Ms. Myers.
3           MR. FRANKLIN:  While she was
4   handcuffed?
5           THE WITNESS:  Uh-huh.
6           MR. PARKER:  You said when you saw
7   her?
8           THE WITNESS:  Right.
9           (Witness excused.)
10          (Recess taken.)
11          (Hearing in session.)
12          MR. FRANKLIN:  At this time we will
13  resume.
14          MR. PARKER:  We'll call Sgt.
15  Noorbergen.
16          LEIGH TAYLOR NOORBERGEN,
17  called as a witness, having first been duly sworn,
18  testified as follows:
19               DIRECT EXAMINATION
20  BY MR. PARKER:
21  Q       You were sworn for this morning?
22  A       Yes, sir.
23  Q       State your name, please.
24  A       Leigh Taylor Noorbergen.
25  Q       You are employed at the Chattanooga

116

1   Police Department?
2   A       Yes, sir.
3   Q       How long have you been employed there
4   as a police officer?
5   A       Fifteen and a half years.
6   Q       When were you promoted to Sergeant?
7   A       Four and a half years ago
8   approximately.
9   Q       After you got out of the academy, if
10  you would, take us through your career and
11  different assignments.
12  A       When I first got out of the academy I
13  was assigned to patrol for five years at which
14  time I was assigned to the gang unit for
15  approximately two and a half years, and youth and
16  family services about six months, then recruiting
17  for close to five years.  Then I got promoted to
18  sergeant.
19  Q       Since you have been a sergeant, you've
20  been a patrol supervisor?
21  A       Yes, sir.
22  Q       Last October 12th do you recall the
23  incident we've been talking about today?
24  A       Yes, sir.
25  Q       What was the purpose of your visit

117

1   there to the Kanku's Market?
2   A       To get something to drink.
3   Q       How long were you inside?
4   A       About a minute or less.
5   Q       And you heard Patt Kay's testimony
6   today.  You all just happened to run into each
7   other that day there?
8   A       Yes.  We pulled in at the same time.
9   Q       Did she pull in first or did you?
10  A       I don't remember.
11  Q       Have you seen these photographs that
12  were marked as Exhibit 3?
13  A       I have only seen one with myself in
14  it.  I don't remember which one it is.
15  Q       Assuming Ms. Kay pulled in after you,
16  there would have been room for you to have parked
17  over here next to that wall on the left side of
18  the photograph without blocking the alleyway; is
19  that correct?
20  A       I wasn't blocking the alleyway.
21  Q       You weren't?
22  A       No, sir.
23  Q       Looking at 3A, how would a car get
24  around your vehicle?
25  A       Right here.  You can't see but there

118

1 is plenty of room in between mine and PST Kay's
2 vehicle.
3 Q         As shown on which one of these photos?
4 A         You can't see it from the angle of the
5 shot.
6 Q         But you say there was plenty of room
7 for a vehicle to get between your car and Patt
8 Kay's vehicle?
9 A         Yes, sir.
10 Q         How long were you inside?
11 A         A minute or less.
12 Q         When you came out had you seen Ms.
13 Myers' vehicle before that?
14 A         No, sir.
15 Q         Where was her vehicle when you came
16 out?
17 A         I wasn't really paying attention. PST
18 Kay and I were having small talk, for lack of a
19 better term. My back was to my vehicle. I was
20 facing PST Kay.
21 Q         How did you come to notice the Isuzu
22 Trooper?
23 A         PST Kay whispered under her breath,
24 what's this nut doing taking pictures of your car.
25 I turned to look, and I laughed because I didn't

119

1 know why. I said I don't know.
2 Q         That was the first time you had seen
3 the vehicle?
4 A         Yes, sir.
5 Q         The Isuzu Trooper?
6 A         Yes, sir.
7 Q         Where was Ms. Myers at that point?
8 A         She was in the front of my -- to the
9 front and right of my vehicle.
10 Q         Was she taking pictures?
11 A         Yes, sir.
12 Q         Did you ever ask her why she was
13 taking those pictures?
14 A         No, sir.
15 Q         Just take it from there and tell us
16 what happened next.
17 A         PST Kay and I chitchatted a little
18 longer. I got in my vehicle to leave. PST Kay
19 was walking toward her vehicle. Once I got in my
20 car, I started it up. I was waiting on Ms. Myers,
21 who had walked back to her car and gotten in the
22 driver's side. I was waiting on her to pull out,
23 because she was blocking the alleyway and I
24 couldn't get through. I was waiting for her to
25 pull out so I could go down the alleyway.

120

1 I sat there for what seemed like a
2 minute or so. I noticed her getting back out of
3 the vehicle. When she got out she lifted her hood
4 up on her vehicle.
5 Q         What did you do?
6 A         At this point I think I had moved up a
7 couple of inches in my vehicle. When I saw the
8 hood go up on her car, I got out of my car and
9 approached her and asked what's the problem. She
10 totally ignored my question. I said, I need to
11 see your driver's license. I don't have one is
12 what she said to me.
13 I said, so you're driving without a
14 license?
15 She said, you didn't see me drive.
16 I said, but you got out of the
17 driver's side. You're driving without a license.
18 She started to turn and walk away. I said, you're
19 not free to leave, because at this point there
20 were several factors involved in why she was no
21 longer free to leave. She was taking pictures of
22 me. I didn't know why, but there is nothing
23 illegal about taking pictures of a police car.
24 That was no big deal. Given that and the fact
25 that she was ignoring my questions and was totally

121

1 unresponsive to me, I felt like I needed to
2 investigate the situation further.
3 I also needed to see if her vehicle
4 was really broken down. I didn't know if it was
5 or not. When I walked up there she had not
6 touched anything inside the engine. She was just
7 looking in it. As soon as I asked her for her
8 driver's license, she put the hood down.
9 Q         Let me ask a question here. Was the
10 hood up when you first saw the vehicle?
11 A         No, sir.
12 Q         You saw her open it?
13 A         Yes, sir.
14 Q         Go ahead.
15 A         I forgot where I was. Oh. So when I
16 told her she wasn't free to leave, she continued
17 to walk away. I ordered her to stop. She
18 refused. She started to open her driver's side
19 door. Due to the fact of officer safety
20 reasons -- I don't know this woman. She is being
21 evasive with me. She's unresponsive. I don't
22 know if she is going in that vehicle to get a
23 weapon. I don't know what she is doing. I don't
24 know if she is impaired or drunk or whatever. She
25 was just acting really peculiar to me.

122

1    So when I saw that she opened her
2    door, I put my hand on it and shut it and told her
3    again that she was not free to leave. I asked her
4    what she was doing. She was screaming at me. I
5    don't remember everything she said word for word,
6    but she was screaming. What I mean by screaming,
7    she was shouting. She was very loud. She was in
8    my face. I felt threatened by her actions and
9    tone of her voice.
10    I told her several times to calm down
11    and lower her voice. She refused to do that. At
12    this point I had a bad feeling about the
13    situation, that it could get ugly, so I called for
14    backup on the radio. As I was doing that I saw
15    several people coming up from behind her vehicle
16    in the alleyway like they were looking to see
17    what's going on. So I made the decision at that
18    time to put her in custody until I could figure
19    out what the deal was, what she was doing there
20    and what was going on.
21    At this point I didn't know anything
22    about her mother, where she lived, anything like
23    that. I just felt threatened. I didn't know if
24    these people in the alleyway were her friends or
25    what was going on. Essentially I was there by

123

1    myself. Once I decided to place her into custody,
2    I told her to turn around and put her hands behind
3    her back. She screamed again, for what.
4    I said, turn around and put your hands
5    behind your back. She turned around and I grabbed
6    her by the left wrist and placed one cuff on her
7    and then placed the other one on her. I said,
8    okay, come on. She just stood there and refused
9    to walk. I said, ma'am, come on. I gently nudged
10    her in the direction I wanted her to go, which was
11    towards my car. I never pulled her back. I was
12    prodding her along, trying to get her to walk in
13    the direction she needed to walk. At one point
14    told her to walk and she refused.
15    By this time the daughter had gotten
16    out of the vehicle and came around to where we
17    were. Due to my experience as a police officer, I
18    felt like I was being outnumbered. They could
19    have done anything at that point in time. I put
20    my hand up and said get back because I'm still
21    trying to deal with the mother at the time. She
22    was struggling like she is trying to pull away
23    from me. I continuously had to keep prodding and
24    nudging her along to try and get her in the back
25    of my car.

124

1    Also in my experience, I wanted to
2    hurry up and get this over with as quick as
3    possible, especially when there's people gathering
4    around. You know, riots start that way. People
5    get heated really quick. So I was trying to get
6    the situation over with. She was not allowing me
7    to do that. I was just trying to get her to go to
8    my car. It seemed like forever, and she was
9    resisting vigorously.
10    When we got to the front of her car,
11    the daughter had gone back around to the car like
12    I had asked her to do. When we got to the front
13    Ms. Myers started struggling even harder with me,
14    trying to pull away more. She was very forceful,
15    a lot of energy. I was getting kind of worn out.
16    Even though she was resisting and trying to pull
17    away from me forcefully like that, I was still
18    holding on and being able to maintain somewhat
19    control.
20    Q    Is that the first resistance that she
21    gave, after she was handcuffed?
22    A    No. When I told her to turn around
23    and put her hands behind her back, I had to tell
24    her more than once.
25    Q    Did she then?

125

1    A    Well, she turned around and put her
2    hands right here to the side. I had to put her
3    hands to her back.
4    Q    Go ahead.
5    A    When we were at the front of the car,
6    that's where she really became extremely lively
7    and was trying to pull away from me again. I had
8    my hands on the cuffs in between her hands. In
9    the beginning I had my hands on her left arm just
10    below her elbow. I was gently pushing with my
11    elbow, nudging, just trying to get her to walk
12    forward. At one point I moved my hand up just to
13    the back of her left shoulder right here so I
14    could get a better grip and push her along so I
15    could get her to the back of my car.
16    Once I got her to the back of the car,
17    I noticed other people that had been pumping gas
18    at the gas station. They were coming out and
19    turning around, looking to see what was going on.
20    It was making me nervous. Once I got her to the
21    back of the patrol car --
22    Q    That was after she was cuffed?
23    A    Pardon?
24    Q    That was after she was already
25    handcuffed?

126

1   A       What?

2   Q       That these people were looking to see

3   what was going on?

4   A       I don't know if it was before or not.

5   That's when I first saw them. So I get her to the

6   back of my patrol car. She is quite a bit bigger

7   than me, so it took a lot of energy on my part to

8   get her back there. I asked her to lie down on

9   the trunk of my car so that I could pat her down

10  properly and safely. In the meantime the

11  dispatcher calls me on the radio. She said, Bravo

12  63, is everything okay.

13          Well, it wasn't totally okay at that

14  point because she was still somewhat resistant at

15  that point. I said for now. Well, apparently the

16  dispatcher heard something in my voice because she

17  told my backup to step it up.

18          Ms. Myers refused to lie down on the

19  car. I had to put my hand on her back and another

20  nudge down to the car. Wasn't very forceful. It

21  wasn't slamming her or pushing her, nothing like

22  that. I just laid her down on the car and asked

23  her to spread her feet apart. She refused to do

24  that. I asked her again and she refused again. I

25  put my right foot inside her right foot and gently

127

1   spread her feet apart. I was able to pat her down

2   at that point with no further problem.

3          Once I finished patting her down and

4   was going to put her in the back of my car, I

5   escorted her around to the side of my car. I put

6   my hand on top of her head so she wouldn't hit her

7   head on the upper part of the door getting in the

8   car. That's normal that we conduct -- that's when

9   my backup arrived, after I got in the car.

10  Q       What happened next?

11  A       Once I got her in the back of the car,

12  I was getting into the driver's side of my car. I

13  believe it was the daughter that approached. She

14  was somewhat disturbed as well. I said, your

15  mother is under arrest. Ms. Myers told her

16  daughter to get her grandmother. Her grandmother

17  came back up there too. I told her the same thing

18  because I wanted to hurry up and get her out of

19  the situation. That's what we were trying to do,

20  get them in the car and go. We don't wait around

21  at the scene, that kind of thing. You just get in

22  the car and go, and that's what I was trying to

23  do. I advised them to speak to the other officer

24  that had pulled up and PST.

25  Q       Did you tell either one, the daughter

128

1   or her mother that she was under arrest for

2   disorderly conduct?

3   A       I don't remember.

4   Q       So after you told them that, how long

5   was it after you answered that question that you

6   left?

7   A       After I told them what?

8   Q       That Ms. Myers was under arrest. How

9   long was it after that point that you left?

10  A       Maybe 15 seconds.

11  Q       So in other words, contrary to what

12  you said just a few minutes ago, this was not just

13  temporary custody to find out what was going on.

14  She was actually under arrest and was going to be

15  hauled off to jail as soon as you made the

16  decision to put those handcuffs on?

17  A       No, sir. She became disorderly and

18  resisting arrest after that.

19  Q       Didn't you say about three or four

20  minutes ago that you decided to take her into

21  custody, that it wasn't really an arrest, but you

22  wanted to find out what was going on?

23  A       I never said it wasn't really an

24  arrest, sir.

25  Q       I must have misunderstood you. The

129

1   decision was made immediately, and once you put

2   those handcuffs on her she was going to go to

3   jail; correct?

4   A       I put the handcuffs on her because of

5   her behavior.

6   Q       So you made the decision at that point

7   to --

8   A       No, sir. So I could figure out what I

9   was going to do.

10  Q       Okay. What did you do from that point

11  forward until the time you left Kanku's? What

12  exactly did you do to further investigate what was

13  going on? You haven't told us that you asked her

14  a single thing.

15  A       I wasn't able to.

16  Q       You just hauled her off to jail;

17  right?

18  A       No, sir. She was screaming at me and

19  resisting arrest. I wasn't able to find out why

20  she was blocking the alleyway.

21  Q       I know your attention was focused on

22  Ms. Myers and not PST Kay, but do you know about

23  how far PST Kay was from the scene?

24  A       Which part of the scene?

25  Q       When Ms. Myers was allegedly

130

1   screaming.

2   A        Thirty to forty feet.

3   Q        Don't you think it's somewhat odd that
4   she didn't hear anyone screaming?

5   A        She did say our voices were loud.

6   Q        In the academy and in subsequent
7   training that you've had, have you been taught the
8   importance of documenting things accurately?

9   A        Yes, sir.

10  Q        All your career you have been taught
11  that; correct?

12  A        Yes, sir.

13  Q        Why is that important?

14  A        It's important so other people can
15  know the facts.

16  Q        What is an affidavit of complaint?

17  A        Basically it's an arrest report,
18  basically an arrest warrant.

19  Q        Have you seen what has been marked
20  Exhibit 4?

21  A        Yes, sir.

22  Q        That's the affidavit of complaint that
23  you filled out that evening after your arrested
24  Ms. Myers?

25  A        Yes, sir.

131

1   Q        Where did you fill this out?

2   A        At the jail.

3   Q        The affidavit of complaint is the
4   basis upon which the prosecution will proceed;
5   correct?  It sets out the probable cause to arrest
6   someone, doesn't it?

7   A        Yes, sir.

8   Q        It's important to be extremely
9   accurate in these documents, is it not?

10  A        No, sir.

11  Q        It's not?

12  A        You don't have to go into great detail
13  in the affidavit of complaint.  That's what court
14  is for.

15  Q        That wasn't my question.  My question
16  was, it's important to be accurate in what you say
17  in and affidavit; correct?

18  A        You said extremely accurate or
19  something.  It's important to be accurate.

20  Q        This is the affidavit of complaint,
21  and that is given under oath, is it not?

22  A        Yes, sir.

23  Q        You swear that the facts in this
24  affidavit of complaint are true?

25  A        Yes, sir, I do.

132

1   Q        This is the document upon which the
2   prosecution proceeds?

3   A        Yes, sir.

4   Q        So it's important to be very accurate
5   in what you state in an affidavit of complaint, is
6   it not?

7   A        Yes, sir.

8   Q        Now let's take a look at this
9   affidavit.  Look at page two of Exhibit 4 which is
10  just a somewhat enlarged copy of a narrative.  Is
11  that your handwriting there?

12  A        Yes, sir.

13  Q        So it says on 10/12/05, which is
14  October 12th of 2005, at approximately 19:07
15  hours.  That is 7:07 p.m.?

16  A        Yes, sir.

17  Q        I encountered the defendant in the
18  alleyway next to Kanku's at 1000 McCallie Avenue.
19  Is that correct?

20  A        Yes, sir.

21  Q        Then the next thing it says, she had
22  pulled her Isuzu Trooper into the alleyway.  Okay.
23  Didn't you tell us just a few minutes ago that the
24  first time you saw the Isuzu Trooper was when Patt
25  Kay called your attention to it and you turned

133

1   around and saw it?

2   A        Yes, sir.

3   Q        That statement right there is
4   incorrect?

5   A        No, sir.

6   Q        How do you know she pulled the Isuzu
7   Trooper into the alleyway?

8   A        Based on the facts that I was going on
9   at the time, I thought she had pulled the vehicle
10  in there.  She got out of the driver's side and
11  got in the driver's side twice.

12  Q        You assumed she had pulled the Trooper
13  in there?

14  A        Based on the information that I had.

15  Q        Yes or no, did you assume that?

16  A        I assumed that based on the
17  information that I had.

18  Q        It says, began taking pictures of me
19  with a digital camera; correct?

20  A        Yes, sir.

21  Q        I approached and asked her for her
22  driver's license or I.D.  Correct?

23  A        Yes, sir.

24  Q        You didn't say anything at all in this
25  affidavit of complaint about calling or going up

134

1  to her and asking her if she needed assistance or
2  what was going on?
3  A          No, sir.
4  Q          She states she didn't have one.
5  Defendant turned around and walked away.  I
6  advised her to stop, but she refused and tried to
7  enter vehicle.  At this time she began to scream
8  at me.  I told her not to enter vehicle, but she
9  continued to try.  Is that correct?
10 A          Yes, sir.
11 Q          I shut the door before she could make
12 entry and advised her she was under arrest for
13 disorderly conduct.
14 A          Yes, sir.
15 Q          I ordered her to turn around with her
16 hands behind her back but again she refused.
17 Correct?
18 A          Yes, sir.
19 Q          And the last thing it says, I
20 attempted to place her in custody at which time
21 she resisted my efforts vigorously.  Correct?
22 A          Yes, sir.
23 Q          Contrary to what you said a few
24 minutes ago, this says that she started to resist
25 your efforts vigorously at the time that you

135

1  attempted to place her in custody.
2  A          I beg your pardon?
3  Q          Was she in custody after she was
4  handcuffed?
5  A          Yes, sir.
6  Q          She wasn't in custody before she was
7  handcuffed, was she?
8  A          No.  She was not free to leave,
9  though.
10 Q          You said, I attempted to place her in
11 custody at which time she resisted my efforts
12 vigorously.  Does that imply to you as it does to
13 me that the vigorous resistance was before she was
14 handcuffed?
15 A          No, sir.  She resisted vigorously at
16 different times during the incident.
17 Q          That's given under oath, is it not?
18 A          Yes, sir.  The Magistrate signed off
19 on it, too.
20 Q          The magistrate released this woman on
21 her own recognizance; is that correct?
22 A          I don't know, sir.
23 Q          When did you find out that Ms. Myers
24 worked at the postal service?
25 A          I believe after I got to jail, but I'm

136

1  not sure.
2  Q          When you have multiple charges against
3  someone, do you know if they are required to post
4  bond for each of the charges?
5  A          I don't know, sir.  I'm not a lawyer,
6  sir.
7  Q          Did you do a use of force report?
8  A          No, sir, I didn't.
9  Q          Why not?
10 A          I didn't think about it because I used
11 very little force against her.  So I didn't do
12 one.
13 Q          You used very little force against
14 vigorous resistance?
15 A          That's correct.
16 Q          The fact that she raised her voice to
17 you, that constituted disorderly conduct, that and
18 the fact that she was taking pictures of your car?
19 A          She refused to follow my instructions
20 when I told her she was not free to leave.  She
21 was shouting at me.  There was a crowd gathering
22 in the rear of her vehicle as well as by the gas
23 pumps at Kanku's.
24 Q          Have you ever reviewed the disorderly
25 conduct statute that's marked Exhibit 7?

137

1  A          Yes, sir.
2  Q          Tell me, if you would in Exhibit 7
3  which specific part of that statute that she
4  violated and how.
5  A          A person commits an offense who is in
6  public with intent to cause public annoyance and
7  alarm, engages in violent or threatening behavior.
8  That's one.  She engaged in threatening behavior
9  and what I thought may have become violent.  She
10 also -- Section B, a person also violates the
11 section who makes unreasonable noise which
12 prevents others from carrying out lawful
13 activities.  That's when she was shouting and
14 causing a crowd to gather.
15 Q          You're the only one who saw the crowd
16 gather; correct?
17 A          No, sir.  She saw it as well.
18 Q          That was after she was handcuffed,
19 wasn't it?
20 A          No, sir, not according to her
21 statement.
22 Q          This case was set in court for
23 December 1st, wasn't it?  You don't even know, do
24 you?
25 A          I know when I saw that it was set.  It

138

1   was originally set for November 10th at 1:30, the
2   1:30 docket.  Then the next time that I saw, it
3   was scheduled for January 5th at 1:30.  The 1:30
4   docket we're not supposed to go to.  The only
5   docket that we go to is 8:30 in the morning.  I
6   was not aware of a December 1st docket.
7   Q          Have you ever bothered to check on the
8   status of the case?
9   A          I checked periodically the dockets to
10  see when the court date was.  I didn't think that
11  she would plead guilty.  I thought if she went to
12  the 1:30 docket it would be reset.
13  Q          How often did you check on it after
14  the arrest?
15  A          I don't know how many times I checked.
16  Q          During October, November, and December
17  how often did you check?
18  A          I don't know how many times, because I
19  checked the docket quite often to see when the
20  officers who work under me, when their court dates
21  are.
22  Q          December 7th, I believe, was the date
23  that you gave your statement to Sgt. Mincy?
24  A          Yes, sir.
25  Q          Did you tell him that you didn't have

139

1   any idea what the status of the case was that day?
2   A          Yes, sir.
3   Q          So you hadn't checked too recently,
4   had you, on December 7th; correct?
5   A          No, that's not true.  What you just
6   said is not true.
7   Q          Did you review the summary of the
8   radio traffic?
9   A          I listened to the radio traffic.
10  Q          Would you agree with me that it was
11  exactly two minutes after you said that you were
12  out with the party that you advised the dispatcher
13  that you had the party in custody?
14  A          I don't remember.
15  Q          Does that sound about right to you?
16  A          I don't remember.
17  Q          I'm asking you based upon your
18  experience.  Were you there on the scene that day
19  approximately two minutes?
20  A          Well, unless you're in that situation,
21  it's kind of hard to tell an accurate time frame.
22  Q          Are you familiar with the statute on
23  resisting arrest?
24  A          Yes, sir, somewhat.
25  Q          Is it your contention that she

140

1   resisted your arrest or that she resisted after
2   the arrest?
3   A          She resisted arrest.
4   Q          And you're familiar with the perjury
5   statute, aggravated perjury statute?
6   A          Somewhat, yes, sir.
7   Q          And aggravated perjury -- I'll let you
8   read along with me.  A person commits an offense,
9   who with intent to deceive commits perjury as
10  defined in 39-16-7; and (2) the statement is
11  false, the false statement is made during or in
12  connection with an official proceeding and the
13  statement is material.
14             Is that correct?
15  A          Yes.
16  Q          This affidavit of complaint you signed
17  under oath?
18  A          Yes, sir.
19  Q          And that was in connection with the
20  prosecution of Valerie Myers?
21  A          Yes, sir.
22             MR. PARKER:  May I have just a moment,
23  please?
24             MR. FRANKLIN:  Yes.
25             (There was a brief pause in

141

1   proceedings.)
2             MR. PARKER:  That's all the questions
3   I have.
4             CROSS-EXAMINATION
5   BY MR. BENNETT:
6   Q          Counsel asked you about the contents
7   of the facts section.  In particular he asked you
8   if there was anything in here about your having
9   asked her if she needed assistance.  There's
10  nothing like that in there, is there?
11  A          No, sir.
12  Q          Likewise, there is nothing in here
13  about her taking pictures of your vehicle, is
14  there?
15  A          Yes.  I think that is in there.
16  Q          That she was taking pictures of your
17  vehicle?
18  A          Yes.
19  Q          So there is.  I stand corrected.
20  There's nothing in here about your having made a
21  radio call to dispatch, saying that you were
22  checking a suspicious vehicle, is there?
23  A          No, sir.
24  Q          But you did that, didn't you?
25  A          Yes, sir.

142

1  Q        But you didn't include that in the
2  affidavit of complaint?
3  A        No, sir.
4  Q        Is there a particular reason you
5  didn't include that in the affidavit?
6  A        I didn't think it was relevant at the
7  time.
8  Q        Now, down at the bottom it says, I
9  attempted to place her in custody.  Now, when you
10  state in custody, when you were trying to state
11  that, you were trying to take her to the car --
12         MR. PARKER:  She wrote what she wrote.
13  If she wants to reinterpret what she wrote, I
14  object.
15         MR. BENNETT:  Mr. Chairman, the issue
16  here is whether she falsified.  The issue is what
17  is meant, did she intend to deceive.  What she
18  means by the words she uses is very relevant.
19         MR. FRANKLIN:  She can further explain
20  for clarification.
21         MR. BENNETT:  Thank you, Mr. Chairman.
22  BY MR. BENNETT:
23  Q        You attempted to place her in custody.
24  Now, as Counsel pointed out, she was already
25  handcuffed; correct?

143

1  A        At which point?
2  Q        Well, let's see.  Was she resisting
3  your efforts vigorously before you cuffed her,
4  after you cuffed her, or both?
5  A        A little of both.
6  Q        A little of both.  Okay.  So when
7  you're talking about custody here, are you being
8  exclusive?  Are you saying -- when you say
9  custody, does that mean when she's in the car,
10  does that mean when she's handcuffed, or is there
11  a particular meaning that you're giving to the
12  word custody?
13  A        Custody to me is where I can have
14  control of the situation to evaluate it further.
15  Q        And I guess whether someone is in
16  custody ultimately depends on the situation
17  itself?
18  A        Yes, sir, it does.
19  Q        Now, during the course of these
20  events, did you ever reach the conclusion that Ms.
21  Myers was, as Sgt. Mincy put it, being smart?
22  A        No.  I didn't know what she was doing.
23  Based on the facts that I had, I didn't know if
24  she had a mental illness or she was impaired,
25  intoxicated in any way.  I didn't know if the

144

1  vehicle was really broken down.  I felt like I had
2  a duty to find out if it was or not.  If I was
3  able to find that out, that it was broken down, I
4  could have offered my assistance.  She never
5  allowed me to do that.
6  Q        Of course, you recall what Sgt. Mincy
7  said about -- in his report about you thought she
8  was being smart.  Did you ever tell Sgt. Mincy
9  that?
10  A        I don't believe I did.
11         MR. BENNETT:  Mr. Chairman, may I
12  approach?
13         MR. FRANKLIN:  Yes.
14         MR. BENNETT:  I'll show the witness
15  what has been marked Exhibit 15.
16         MR. FRANKLIN:  Let the record show
17  this is Exhibit 15.
18         (Exhibit 15 was marked and received
19  into evidence.)
20  BY MR. BENNETT:
21  Q        Sgt. Noorbergen, do you recognize this
22  diagram?
23  A        Yes, sir.
24  Q        Did you prepare this diagram?
25  A        Yes, I did.

145

1  Q        Does this diagram to the best of your
2  knowledge and recollection depict the scene at the
3  time of the arrest?
4  A        Yes, sir.
5  Q        Now, unfortunately we don't have an
6  overhead.  Where were you and Ms. Myers at the
7  time you were having your discussion?
8  A        It started at the front of her
9  vehicle.
10  Q        That vehicle is labeled Myers SUV?
11  A        Correct.
12  Q        Okay.
13  A        Then went around to the driver's side
14  of Ms. Myers vehicle.
15  Q        That would be where the "X" is next to
16  what you've labeled Myers SUV?
17  A        Yes, sir.
18  Q        Where were the individuals in the
19  alleyway?
20  A        There's an "X" behind Ms. Myers'
21  vehicle, and that's where the people were that
22  were in the alleyway.
23  Q        If you would, break it down for the
24  Council and tell us simply and succinctly why you
25  arrested Ms. Myers.

146

1    A        Based on a number of factors. As you
2    know, the whole incident started with Ms. Myers
3    taking pictures of my patrol car, which I found
4    odd because I didn't know why she was taking
5    pictures. But I was going to let that go if she
6    wanted to take pictures. Got in my car to leave
7    and was trying to go about my business. As a
8    supervisor, I'm not required to go out and make
9    arrests and write tickets. I'm basically required
10   to supervise. I don't make as many arrests as
11   they do, but I do occasionally come across a
12   situation where I have to make an arrest.
13           Once I got back into my vehicle to
14   leave, I waited for a few minutes, waiting for her
15   to pull out so I could go down through the
16   alleyway because I thought she was leaving and she
17   would be pulling forward. So I waited, it seems,
18   like a long time. It probably wasn't but about a
19   minute or two. I saw her get back out of the
20   vehicle and pop the hood. So I got out of my car.
21           Based on her actions -- everything was
22   suspicious to me, or peculiar is another word I
23   guess. I felt like I needed to find out what was
24   going on. I approached her in her vehicle. I
25   said, what's the problem. She ignored me and

147

1    didn't answer. I said, I need to see your
2    driver's license.
3           She said, you didn't see me drive.
4    She actually yelled that, you didn't see me drive.
5           I said, you got out of the driver's
6    side of the vehicle.
7           She said, well, I don't have one.
8           I said, so you're driving without a
9    license. Given that fact, along with everything
10   else, now I had, I guess, probable cause or
11   reasonable suspicion to prevent her from leaving
12   the scene so that I could finish the investigation. I
13   told her she was not free to leave. She turned to
14   walk away from me, and I told her to stop. I
15   yelled at her to stop. I had to yell at her
16   because she was yelling at me, and I had to yell
17   where she could hear me.
18           When we got back to the driver's side
19   of the vehicle, she tried to open it. It's a
20   scary situation when you're out there by yourself.
21   You don't know this person. You don't know what
22   they're going to get out of their vehicle. You
23   don't know if it's a weapon. You just don't know.
24   She could be the nicest person in the world, but
25   you don't know her. You've got to keep your guard

148

1    up in order to assess the situation accurately. I
2    didn't want to get hurt.
3           I shut her door and I told her again
4    she was not free to leave. I asked her, I said,
5    why are you blocking the alleyway? At that point
6    she got really angry. You could tell. She was
7    shouting at me some more. I don't remember
8    everything that she said on that date. She was
9    shouting at me. When I saw people gathered in the
10   alleyway, like I said, I knew I was outnumbered.
11   I didn't know who those who people were. I didn't
12   know if they were her buddies or family or what.
13           At that point, that's when I decided
14   to take her into custody. I had to gain control
15   of the situation before it got even more out of
16   control. So that's what I did. I placed her in
17   custody. I asked her twice -- had to ask her
18   twice to turn around and put her hands behind her
19   back. She didn't do it until the second time.
20   She still didn't put her hands behind her back. I
21   had to do that for her.
22   Q        Sgt. Noorbergen, let me draw your
23   attention back to the affidavit of complaint. You
24   stated here that you screamed -- she screamed at
25   you. Now, if you would tell us when you say she

149

1    screamed what you meant. What did you mean when
2    you said she screamed?
3    A        She shouted at me. She yelled at me.
4    There's all kinds of different definitions for
5    screaming. That's what I meant, she shouted, she
6    yelled.
7    Q        Being relative, were you also
8    screaming at this lady?
9    A        Yes, sir.
10   Q        From your perspective were you
11   screaming?
12   A        Yes, sir, after she screamed at me.
13   Q        Was she as loud as you were?
14   A        Yes, sir.
15   Q        You stated here that she resisted your
16   efforts vigorously. Once again, what does
17   vigorously mean?
18   A        I take it to mean strong-willed,
19   forcefulness, a lot of energy.
20   Q        Again putting it in perspective, how
21   much effort did it take you to get her from her
22   car to your car?
23   A        It took quite a bit of effort to get
24   from her car to my car because at first she was
25   refusing to walk. I had to nudge her along or

150

1 prod her along to get her to move. I even
2 verbally said walk to my car. She refused.
3 Q         Let's break that down for the Council.
4 If you were just nudging her, can you explain to
5 us how she could have been resisting vigorously?
6 A         At that point it was not vigorous. It
7 was the next point. It would go from vigorous to
8 more of a passive resistance to more vigorous.
9 Q         I probably interrupted you. Go ahead
10 with that part of your description.
11 A         Once we got to the front of her SUV,
12 she stopped again. She started doing like this,
13 just pulling away. I'm trying to hold onto her
14 handcuffs so that she can't get away. I didn't
15 know if she was going to run. I didn't know if
16 she was going to try to assault me. Police
17 officers have been assaulted many times after a
18 person is handcuffed. I was just trying to hold
19 on and get her to stop, you know, telling her the
20 whole time to stop, stop.
21 Q         Sgt. Noorbergen, is that the point
22 where you're talking about vigorous resistance?
23 A         Yes, sir.
24 Q         Tell us what degree of force you used
25 or what degree of effort you used to maintain

151

1 control of the situation.
2 A         I was holding onto her. I was just
3 basically preventing her from actually pulling
4 away from me. I wasn't using any type of force
5 other than when I nudged her along to prod her
6 along. I was not using -- I was just holding on I
7 guess you could say.
8 Q         When she was having this passive
9 resistance that you described, were you having to
10 nudge and prod? Is that when you're talking of
11 the nudging?
12 A         Yes. That's when I was nudging her
13 and she stopped.
14 Q         You weren't nudging her when she was
15 moving her arms from side to side?
16 A         No, sir.
17 Q         At that point you were just holding
18 her?
19 A         Yes, sir.
20 Q         When she was still and not moving,
21 that's when you were having to prod her forward?
22 A         Yes, sir.
23 Q         Rather than looking at each step from
24 car to car, let's assess the situation from the
25 time that you got to your car. By the time you

152

1 got to your car were you tired?
2 A         Oh, yes. I was very tired.
3 Q         Were you winded?
4 A         Yes, sir.
5 Q         I don't mean to ask a personal
6 question, but at the time of this arrest about how
7 much did you weigh?
8 A         Between 135 and 140.
9 Q         And approximately how much did Ms.
10 Myers weigh?
11 A         I would say around 200 maybe, maybe
12 less.
13 Q         To your knowledge is that in the
14 affidavit?
15 A         I don't remember.
16 Q         Under the terms of police department's
17 policy, were you using what you would call a
18 soft-hand technique?
19 A         Yes, sir.
20 Q         As counsel pointed out, you didn't
21 file a use of force report. Why is that?
22 A         It's not common practice to file a use
23 of force report every time you make an arrest, but
24 according to policy, I probably should have filed
25 a use of force report because it was using the

153

1 soft-hand techniques. I just really didn't think
2 about it. She was not injured. I was not
3 injured. I just really didn't think about it.
4 Q         Now, you recall that Sgt. Mincy
5 interviewed you on December 7th, 2005 on this
6 matter?
7 A         Yes, sir.
8 Q         That was approximately two months
9 after this incident; is that correct?
10 A         Yes, sir.
11 Q         Did you have a chance to prepare for
12 the interview?
13 A         No, sir, I didn't.
14 Q         About how much advance notice did you
15 have of that interview?
16 A         Maybe less than a day.
17 Q         Before the interview had you been
18 given a copy of Ms. Myers' written complaint
19 against you?
20 A         Right when I got there.
21 Q         Right when you got there?
22 A         Yes, sir.
23 Q         That was as much advance notice of
24 what you were being questioned about as you had?
25 A         I got a notice that there was going to

154

1  be an investigation.

2  Q          After you gave the statement, did you

3  have an opportunity to review Sgt. Mincy's notes?

4  A          I reviewed his summary and his report

5  to internal affairs.

6  Q          Did you receive that before it was

7  sent to the chief for disciplinary action?

8  A          No, sir.

9  Q          So before he submitted his final

10  report, you didn't have a chance to review it at

11  all?

12  A          No, sir.

13  Q          As we sit here today in this court-

14  room, I realize this is a different environment.

15  It's quieter.  It's lit.  As you look back on it,

16  do you think that Ms. Myers was being disorderly?

17  A          Yes, sir, I do.

18  Q          Why is that?

19  A          She refused to obey my orders first of

20  all.  She was unresponsive and ignoring me in the

21  beginning, but when she did finally start to

22  attempt to answer a question or make a statement,

23  she was shouting at me.  When I told her she

24  wasn't free to leave, she refused to obey that

25  order.  Once we got around the side of her car,

155

1  she continued to shout at me.  The crowd started

2  to gather, and I felt threatened.  She was being

3  loud.

4  Q          As we stand here today, and here

5  again, I realize it's a different situation,

6  looking back, do you believe that Ms. Myers

7  resisted arrest?

8  A          Yes, sir, I do.

9  Q          Very succinctly, why do you think

10  that?

11  A          When I first told her that she was

12  under arrest and asked her to put her hands behind

13  her back, she refused.  I asked her a second time

14  to put her hands behind her back and she refused.

15  I grabbed her arm and put one cuff on and then the

16  other cuff on.  Then she refused to walk even

17  after I told her to walk.  After I tried to nudge

18  her forward, she still refused and shouted at me

19  some more then.  Then when she finally did walk

20  with my urging, when we got in front of the

21  vehicle she stops again and starts vigorously

22  trying to pull away from me.  I was just trying to

23  hold on so she couldn't get away.

24          Once that part stopped and I was able

25  to nudge her forward again to walk towards my car,

156

1  I still had to put an effort into getting her to

2  do that.  Then once at the back of my car, I

3  believe I even sort of rested, holding onto the

4  handcuffs and just kind of standing there for a

5  minute, trying to catch my breath.

6          MR. BENNETT:  Mr. Chairman, may I

7  approach the witness?

8          MR. FRANKLIN:  Yes.

9          (Exhibit 16 was marked and received

10  into evidence.)

11  BY MR. BENNETT:

12  Q          Let me show you what we've marked for

13  evidence as Exhibit 16.  Sgt. Noorbergen, tell me

14  about your evaluations for this year.  How did you

15  do?

16  A          This year it was strong.  It was a 4.8

17  out of a 5.00.

18  Q          Five is the maximum possible score you

19  can obtain?

20  A          I'm sorry.  It was 4.994.#.

21  Q          Even with your suspension?

22  A          Yes, sir.

23  Q          The second page of the document I

24  handed you is labeled as Chattanooga Police

25  Department Report.  It's your efficiency rating,

157

1  dated April 5.  Is that the evaluation for this

2  year?

3  A          Yes, sir.

4          MR. FRANKLIN:  Second page?

5          THE WITNESS:  Third page.

6  Q          So your evaluation for this year was

7  just under a five even with the suspension?

8  A          Yes, sir.

9  Q          How about your evaluation for the past

10  years, how have you done?

11  A          They -- in the past -- well, since I

12  have been a supervisor, they have all been

13  outstanding with the exception of this year.

14  Q          Attached to that package you'll see

15  evaluations for the past several years.  Are these

16  all your evaluations?

17  A          Yes, sir.

18  Q          By and large you've received

19  outstanding evaluations, have you not?

20  A          Yes, sir.

21  Q          The first two pages I showed you

22  appear to be your resume.  It includes some

23  citizen complaints, vehicle accidents, et cetera.

24  Is this sort of your -- for want of another term,

25  and this may be an incorrect term, an internal

158

1  affairs resume?

2  A        Yes, sir.

3  Q        Have you ever had a disciplinary

4  action sustained against you?

5  A        No, sir.

6  Q        Have you ever been accused of anger?

7  A        No, sir.

8  Q        Have you ever been accused of

9  falsehood?

10  A        No, sir.

11  Q        Has there ever been any kind of action

12  taken by the department against you that would

13  impune your integrity aside from this one

14  incident?

15  A        No, sir.

16  Q        Sgt. Noorbergen, can you tell us how

17  the suspension has affected you?

18  A        Well, obviously monetarily it --

19  Q        Take a minute if you need to.

20  A        Monetarily it's been bad enough, but

21  the worst part is my character and integrity has

22  been dragged through the media.  I have an

23  11-year-old son.  I had to explain the situation

24  to him.  I've worked hard in my 15 and a half

25  years to this department and this city.  You can

159

1  tell by my record that I've never had a problem.

2  I've never had a discipline problem.  Never had an

3  anger management problem.

4          For the 28 days I was off, I cried at

5  least once a day.  I've never been through

6  anything like this in my life.  I am a good

7  officer, and I go out there and I do a good job.

8  For somebody to say that I lied and that I

9  falsified an official document when I know in my

10  heart that is not true, you have no idea what that

11  does to you.

12          I've given numerous hours to this city

13  for free because I love my job, and I do it well.

14  I've had a lot of support through this, but still,

15  when you see your picture up there and the things

16  that were said, it's humiliating.  My ex-husband

17  is trying to use it against me now to try to get

18  custody of our son.  Given my record and my past,

19  I just don't understand it.  I don't understand

20  how Chief Parks could have came to the conclusion

21  that he came to.

22          It's been really, really hard to deal

23  with.  I'm back at work now.  I've been back at

24  work for a couple of weeks.  It's not the same.  I

25  loved my job.  I have been the happiest I've been

160

1  in the department in the last four and a half

2  years since I've been back out on the street as a

3  supervisor.  It's just not the same.

4          MR. BENNETT:  No further questions.

5          (Recess taken.)

6          (Hearing in session.)

7          REDIRECT EXAMINATION

8  BY MR. PARKER:

9  Q        You were describing, were you not,

10  Sgt. Noorbergen, how this has affected you just

11  before we took our break?

12  A        Yes, sir.

13  Q        Have you thought at all about how this

14  episode has affected Valerie Myers?

15  A        I'm not sure what you mean.

16  Q        About how going to jail affects

17  somebody.

18  A        Yes.  Actually I have thought about

19  it.

20  Q        You've thought about how it affected

21  her 18-year-old daughter?

22  A        She could have prevented the incident.

23  Q        The 18-year-daughter could have?

24  A        No.  Ms. Myers could have prevented

25  it.

161

1  Q        You're not going to answer my

2  question?

3  A        (No audible response.)

4  Q        One other thing in the affidavit of

5  complaint again.  She continued to try to enter

6  her vehicle.  I shut the door before she could

7  make entry.  I advised her she was arrest for

8  disorderly conduct.  I ordered her to turn around

9  with her hands behind her back, but again she

10  refused.

11          That's what you wrote; correct?

12  A        Yes.

13  Q        You told her she was under arrest for

14  disorderly conduct even before you asked her to

15  turn around so you could handcuff her according to

16  the affidavit of complaint that you wrote that

17  night?

18  A        Yes, sir.

19          MR. PARKER:  That's all.

20          MR. FRANKLIN:  Do we have questions

21  from council members?

22          MR. POWERS:  I just wanted to ask

23  maybe one or two questions.  That alley that you

24  were parked in, is it illegal to park in that

25  alley?

162

```
1      THE WITNESS: There's no signs that
2   say no parking. I was further back from the
3   actual alley. It's hard -- you can't tell from
4   the picture. I was further back than -- when you
5   first pull in is where Dairy Queen used to be.
6   There's an arrow pointing east through the
7   alleyway.
8          Let me explain the reason I was even
9   parked there. When I go to Kanku's my usual
10  parking place, if you look at the map, is on the
11  other side of the store. On this night in
12  particular the lottery amount was way up there.
13  Every space there was taken. I knew I wasn't
14  going to be in there very long just to get a
15  drink. Where I parked I wasn't blocking the
16  alleyway. Vehicles could get in and out from
17  where I was. With her blocking the alleyway,
18  nobody could get around her.
19      MR. POWERS: Thank you.
20      MR. FRANKLIN: Did you have difficulty
21  getting the handcuffs on her?
22      THE WITNESS: Yes, sir. I --
23      MR. FRANKLIN: I know what you said
24  about your weight and I know what you said about
25  her weight and the difficulty getting her down to
```

163

```
1   the police car, but you didn't have any problems
2   getting the handcuffs on her because she wasn't
3   resisting arrest enough that you could get the
4   handcuffs on her?
5       THE WITNESS: She wasn't resisting a
6   great deal at that point, but she was showing
7   quiet resistance. Somebody can actually still be
8   resisting arrest after a handcuff.
9       MR. FRANKLIN: I just wondered if you
10  had any problem getting the handcuffs on. You
11  said you weighed 140 and she weighed about 200
12  pounds?
13      THE WITNESS: The way she was shouting
14  at me and was in my face, I felt threatened at
15  that point. I didn't know what she was going to
16  do.
17      MR. FRANKLIN: You also talked about
18  how the crowd began to form and you felt
19  threatened. I haven't been through the police
20  academy and don't know what training is like.
21  When you feel threatened do you still go on and
22  make the arrest without calling backup?
23      THE WITNESS: I had already called for
24  backup and they were on their way.
25      MR. FRANKLIN: You didn't have backup,
```

164

```
1   though?
2       THE WITNESS: Right.
3       MR. FRANKLIN: You are trained to
4   still go ahead and make the arrest if you feel
5   threatened?
6       THE WITNESS: Yes, sir, to try and
7   hurry and get it done before they get closer
8   because you don't know who they are.
9       MR. FRANKLIN: Okay. No further
10  questions.
11      MR. POWERS: Sgt. Noorbergen, what
12  time of day was it when the incident occurred?
13      THE WITNESS: Around 7:00 p.m.
14      MR. POWERS: In October had we gone
15  back to -- was it still light then?
16      THE WITNESS: It was not totally dark,
17  but not totally light, either.
18      MR. POWERS: The sun was going down
19  but it --
20      THE WITNESS: Right. It was dark by
21  the time we got to the jail, which took us five
22  minutes after we left.
23      MR. POWERS: When you finally got Ms.
24  Myers handcuffed and in the car, at what point did
25  you call to see if there were outstanding warrants
```

165

```
1   or anything of that nature? Was that done?
2       THE WITNESS: That was on my way to
3   jail.
4       MR. POWERS: Okay. Would you say that
5   this whole thing was kind of escalated by mannerisms and
6   the way the conversation went as you moved
7   forward? In other words, you don't feel that you
8   had proper cooperation to be able to move through
9   your questioning to begin to analyze what the
10  actual problem was? Isn't that kind of how it
11  escalated?
12      THE WITNESS: Yes, sir. Had she
13  answered my questions to begin with, what's the
14  problem, I need to see your driver's license, had
15  she produced that stuff -- I ran her later to find
16  out if she has a driver's license, and she does
17  have a valid driver's license. She said on that
18  day, I don't have one. Had she stopped and taken
19  a moment to actually speak to me so I could get
20  this information and find out if something was
21  really wrong with her vehicle, even with her not
22  having her driver's license, you know, I could
23  have let that go as long as I knew she had one
24  that was valid.
25      I couldn't get her to answer my
```

166

1   questions or speak to me or, you know, anything.
2   Then once I found out she didn't even have her
3   driver's license, and based on the facts of seeing
4   her get into the driver's side of the vehicle and
5   get out of the driver's side of the vehicle, you
6   know, the natural assumption was that she was
7   driving that vehicle. You can make a DUI on
8   something like that. If the keys are in the
9   ignition, they can be in the passenger seat,
10  parked and you can still arrest someone for DUI.
11          The way she was acting I thought was
12  very bizarre and unusual, and I didn't know if she
13  was impaired or on drugs or mentally ill. I
14  needed to find all that out. She didn't help me
15  find that out, and she didn't allow me to do my
16  job.
17          MR. POWERS: What is the difference
18  between taking somebody into custody and actually --
19  at what point do you move from taking somebody
20  into custody to physically arresting them? What
21  is that and where is that line crossed?
22          THE WITNESS: When you're in a
23  situation such as this that is very tense and
24  hostile and you're in fear, you have to think very
25  quickly. Everything happens very quickly. At the

167

1   point where she was loud and shouting at me and
2   the crowd was starting to gather and in my opinion
3   was driving without a license at that time, that
4   was my perspective at that time because I didn't
5   know any different. You know, I decided to take
6   her into custody in order to attempt to see what
7   was going on. Even once I took her into custody,
8   she still didn't calm down and do what she was
9   told to do in order for me to find out these
10  things.
11          MR. POWERS: Once she was handcuffed
12  and you had gotten her into the car, she is still
13  in custody at that particular point. So after she
14  is in the car and you started to get your breath
15  back and things calmed down a little bit and you
16  got better control of the situation; at that point
17  did you decide to go ahead with the arrest,
18  because it appears at this time from your
19  testimony, you'd had some difficulties in getting
20  her from one point to the car. And so in your
21  professional opinion that constituted resisting
22  arrest?
23          At some point could you have called
24  and gotten information about priors, about maybe
25  even evaluating whether the person was a victim or

168

1   under some kind of influence or something before
2   you left the scene, or did you feel threatened
3   enough based on your surroundings to go ahead and
4   get out of the situation and get to the precinct
5   where you could take further evaluation?
6           And the last thing, just a point of
7   clarification. Did the backup officer get there
8   before you left the scene?
9           THE WITNESS: Right before I left the
10  scene. To answer your other question, once she
11  started the resistance, that's when I made the
12  decision that she was definitely going to jail.
13  Had she not done that, I could have overlooked the
14  disorderly conduct and released her. Once she
15  started the passive and active resistance, I
16  pretty much felt that I didn't have a choice at
17  that time.
18          MR. POWERS: No further questions by
19  me.
20          FURTHER REDIRECT EXAMINATION
21  BY MR. PARKER:
22  Q       Did you stop and eat on the way to the
23  jail?
24  A       No, sir.
25  Q       Do these photographs accurately depict

169

1   the lighting conditions roughly at 7:00 p.m. on
2   October 12th, 2005?
3   A       Like I said awhile ago, it was dark by
4   the time I got to the jail.
5   Q       Do these photographs accurately depict
6   the lighting --
7   A       I don't remember.
8   Q       -- conditions at --
9   A       No. I think it was a little darker.
10  Q       Did you go strait to the jail?
11  A       Yes, sir.
12  Q       That's what, about a mile from this
13  location?
14  A       I'm not sure. Five minutes.
15  Q       In all these photographs I see clouds.
16  In the rest of them the sky is still light, is it
17  not?
18  A       It was dark by the time I got to the
19  jail.
20  Q       The sky is still light as shown in
21  these photographs, is it not?
22  A       I was not at the jail at that point,
23  yes.
24  Q       By the time it took you to drive about
25  a mile, it got dark?

170

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Have you ever heard of contempt of |
| 3 | cop? | |
| 4 | A | No, sir. |
| 5 | Q | You don't know what contempt of cop |
| 6 | is? | |
| 7 | A | No, sir. |
| 8 | Q | Somebody makes an officer mad and they |
| 9 | go to jail for disorderly conduct? | |
| 10 | A | No, sir. |
| 11 | Q | You've never heard that at all? |
| 12 | A | No, sir. |

13  Q   Before you placed Ms. Myers under
14  arrest for disorderly conduct, did you ask her
15  where her license was?
16  A   No, sir. She didn't give me an
17  opportunity.
18  Q   She didn't give you the opportunity to
19  ask her where her license was before you placed
20  her under arrest for disorderly conduct?
21  A   That's correct, sir.
22  Q   Let me make sure I understand the
23  sequence here. The affidavit of complaint says
24  that you told her she is under arrest for
25  disorderly conduct before you put the handcuffs on

171

1  her.
2  A   Yes.
3  Q   You told her to turn around?
4  A   (No audible response.)
5  Q   Then you told her to turn around and
6  be handcuffed?
7  A   I told her to turn around and put her
8  hands behind her back.
9       MR. PARKER: That's all.
10      MS. BENNETT: I do have a question.
11 I'm not sure when the statement was made earlier,
12 but it was something about two minutes from the
13 time of the original call until the arrest. Can
14 you explain exactly what happened in that two
15 minutes, because that seems like a very, very
16 short time to process all of the information when
17 all this happened in two minutes. Did I hear that
18 correctly?
19      MR. PARKER: If I can ask her.
20      MS. BENNETT: Go ahead. Thank you.
21      FURTHER REDIRECT EXAMINATION RESUMED
22 BY MR. PARKER:
23 Q   This is a summary prepared by
24 Christine Burke, who is the evening supervisor in
25 communications. Have you seen that report before?

172

1  A   No, sir.
2  Q   Were you Brave 63 that evening?
3  A   Yes, sir.
4  Q   This report indicates that at 19:05
5  and 57 seconds, which is 7:05 p.m. plus 7 seconds,
6  you advised you were getting out with a 433 in the
7  alleyway at McCallie and Central; correct?
8  A   Yes.
9  Q   And 433 is what?
10 A   Suspicious person.
11 Q   Is that pretty accurate to the best of
12 your recollection as far as the time?
13 A   I didn't know what time it was at the
14 time.
15 Q   If you could, look at the affidavit of
16 complaint and tell me what time the arrest was.
17 A   It was 19.07. That's an approximate
18 time.
19      (Discussion ensued off the record.)
20 BY MR. PARKER:
21 Q   That says 19:05 and 57 seconds. You
22 reported on your affidavit of complaint 19:07,
23 which is three seconds later?
24 A   Approximately.
25 Q   I understand that's an approximate

173

1  time.
2       MR. FRANKLIN: For the record, this is
3  Exhibit 17.
4       (Exhibit 17 was marked and received
5  into evidence.)
6  BY MR. PARKER:
7  Q   That's pretty consistent with what you
8  put in your affidavit of complaint; correct?
9  A   Yes.
10 Q   Let me show you was has been marked
11 Exhibit 17. It indicates that at 19:07 and zero
12 seconds you asked the dispatcher to start another
13 car; correct?
14 A   Correct.
15 Q   That would be a minute and three
16 seconds after you said you were getting out with
17 this party?
18 A   Correct.
19 Q   Is that consistent with your
20 recollection of the timing?
21 A   Yes, sir.
22 Q   Then at 19:07 they asked you if
23 everything was okay and you said for now. Then at
24 19:07 and 57 seconds, which was exactly two
25 minutes after you first got out, you said,

174

1  negative, I've got one party in custody?

2  A       Uh-huh.

3  Q       Correct?

4  A       Correct.

5  Q       Is that consistent with your

6  recollection of the event?

7  A       I guess. I'm assuming.

8  Q       But the timing as far as all of this

9  stuff is consistent with the approximate time you

10  put on your affidavit?

11  A       That's correct.

12  Q       According to this anyway, from the

13  time you got out with her, you advised the

14  dispatcher you're getting out with the suspicious

15  party, until the time you got her in custody was

16  two minutes?

17  A       Yes.

18          MR. PARKER: That's all.

19          MR. FRANKLIN: Anything further?

20          MR. BENNETT: I have nothing further.

21          STEVE PARKS,

22  called as a witness, having first been duly sworn,

23  testified as follows:

24          DIRECT EXAMINATION

25  BY MR. PARKER :

175

1  Q       State your name for the record,

2  please.

3  A       Steve Parks.

4  Q       If you would, start out with when you

5  joined the police department.

6  A       1978.

7  Q       If you would, kind of go through your

8  career with the Chattanooga Police Department.

9  A       About eight years in patrol division

10  on midnight shift. I've had three years as a

11  background investigator and safety officer, eleven

12  years as a command officer over at internal

13  affairs division; about sixteen months as a sector

14  captain over Sector 2; and three years as deputy

15  chief over investigations and support; and little

16  over two years as chief of police.

17  Q       You were appointed chief of police in

18  February of 2004 I believe?

19  A       Yes.

20  Q       Beginning February of 2004?

21  A       Yes.

22  Q       If you would, I'm going to turn it

23  over to you and ask you to explain to the council

24  members why you felt the disciplinary action in

25  this case was warranted.

176

1  A       Simply put, after an investigation by

2  internal affairs investigators, after a review by

3  the internal affairs captain, after a review by

4  the deputy chief over operations and also the

5  captain over Sector 1, which is Sgt. Noorbergen's

6  command officer; after an initial hearing with me

7  where I can talk to people and ask for information

8  and ask for discovery issues, review some

9  interviews and that sort of thing and ask

10  questions myself; after a second disciplinary

11  hearing with me and the command staff including

12  Sgt. Noorbergen; simply put, I came to the

13  conclusion that there was a reasonable lack of

14  factual basis to support the charge of disorderly

15  conduct and resisting arrest.

16          It was made worse that in my opinion

17  there was an enhancement in the actual affidavit

18  of complaint that supports an arrest warrant that

19  suggested there was a level of resistance that in

20  my opinion was not there.

21  Q       Did you also feel that your review of

22  facts, these hearings -- did you also review some

23  of the videotaped statements of the witnesses?

24  A       During the course of the first

25  disciplinary hearing that I held with Sgt.

177

1  Noorbergen and the entire chain of command

2  involved in this, there was a contention in part

3  that there were some discrepancies and that in

4  their there was not a match between the actual

5  summary report and what was said during the course

6  of the interviews that were recorded.

7          There was discovered that there was

8  another police officer that may have been on the

9  premises at the time when this occurred, and this

10  person had not been interviewed. So I asked for

11  three things. I asked for copies of the

12  interviews of Sgt. Noorbergen, PST Kay. I asked

13  for the investigator to go back and locate this

14  sergeant that may have been on the premises at the

15  time of this and interview with him to see if he

16  saw or heard anything that could add some weight

17  to this.

18          I also asked for a copy of the radio

19  traffic that we just talked about because, number

20  one, that's just good business. You want to

21  listen to the radio traffic, but also you want to

22  try and pick up on any background information and

23  background noise. While our officers are on the

24  radio, if someone is hollering in the background,

25  it's picked up. So I wanted to hear that. So I

1
2                    R E P O R T E R ' S   C E R T I F I C A T E

3    S T A T E   O F   T E N N E S S E E   )
                                            :  S S .
4    C O U N T Y   O F   H A M I L T O N   )

5              I ,   C o n n i e   F .   C a r p e n t e r ,   t h e   o f f i c e r
     b e f o r e   w h o m   t h e   f o r e g o i n g   c a u s e   w a s   t a k e n ,   d o
6    h e r e b y   c e r t i f y   t h a t   t h e   w i t n e s s e s   w h o s e   t e s t i m o n y
     a p p e a r   i n   t h e   f o r e g o i n g   t r a n s c r i p t   w e r e   d u l y
7    s w o r n ,   a n d   t h a t   t h e   t e s t i m o n y   o f   s a i d   w i t n e s s e s
     w a s   t a k e n   b y   m e   i n   m a c h i n e   s h o r t h a n d ,   a n d
8    t h e r e a f t e r   r e d u c e d   t o   t y p e w r i t i n g ;

9              T h a t   t h e   e x h i b i t s   a n n e x e d   t o   t h i s
     t r a n s c r i p t   a r e   t r u e ,   a c c u r a t e ,   a n d   t h e   o n l y
10   e x h i b i t s   i n t r o d u c e d   i n t o   e v i d e n c e ,   a n d   t h a t   t h e
     t r a n s c r i p t   w a s   p r e p a r e d   u n d e r   m y   p e r s o n a l
11   s u p e r v i s i o n ,   a n d   a t t a c h e d   t o   t h i s   c e r t i f i c a t e   a n d
     i s   a   t r u e ,   a c c u r a t e   a n d   c o m p l e t e   t r a n s c r i p t   a s
12   p r o v i d e d   b y   l a w ;

13             T h a t   I   a m   n e i t h e r   c o u n s e l   f o r ,   r e l a t e d
     t o ,   n o r   e m p l o y e d   b y   a n d   o f   t h e   p a r t i e s   t o   t h i s
14   a c t i o n ;   a n d   I   f u r t h e r   c e r t i f y   t h a t   I   a m   n o t   a
     r e l a t i v e   o r   e m p l o y e e   o f   a n y   a t t o r n e y   o r   c o u n s e l
15   e m p l o y e d   b y   t h e   p a r t i e s   h e r e t o ,   n o r   f i n a n c i a l l y   o r
     o t h e r w i s e   i n t e r e s t e d   i n   t h e   o u t c o m e   o f   t h i s
16   a c t i o n .   T h e   f o r e g o i n g   t r a n s c r i p t   i s   c o m p l e t e   a n d
     a c c u r a t e   i n   a l l   p a r t i c u l a r s   a s   p r o v i d e d   b y   l a w .
17
               I n   w i t n e s s   w h e r e o f ,   I   h a v e   h e r e u n t o
18   s e t   m y   h a n d   t h i s   2 8 t h   d a y   o f   D e c e m b e r ,   2 0 0 6 .

19

20             C o n n i e   F .   C a r p e n t e r ,
               P r o f e s s i o n a l   C o u r t   R e p o r t e r
21             a n d   N o t a r y   P u b l i c   i n   t h e   s t a t e s
               o f   T e n n e s s e e   a n d   G e o r g i a .
22
23
24
25